FOSTER GARVEY PC
Eryn Karpinski Hoerster, OSB #106126
E-mail: eryn.hoerster@foster.com
121 SW Morrison Street, Eleventh Floor
Portland, Oregon 97204-3141
Telephone: (503) 228-3939
Facsimile: (503) 226-0259

LATHAM & WATKINS LLP
Philip J. Perry*
Andrew D. Prins*
Abid. R. Qureshi*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1359
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com

*Admitted pro hac vice

Attorneys for Plaintiff Pharmaceutical
Research and Manufacturers of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, | Case No.  3:25-cv-01754-IM |
| Plaintiff, | |
| v. | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| DAN RAYFIELD, in his official capacity as Attorney General of the State of Oregon; RICHARD JOYCE, in his official capacity as President, Oregon Board of Pharmacy; AMY KIRKBRIDE, in her official capacity as Vice President, Oregon Board of | **Oral Argument Requested** |

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

Pharmacy; KATHLEEN CHINN, in her official capacity as Member, Oregon Board of Pharmacy; JENNIFER HALL, in her official capacity as Member, Oregon Board of Pharmacy; VICTORIA KROEGER, in her official capacity as Member, Oregon Board of Pharmacy; PRIYA PATEL, in her official capacity as Member, Oregon Board of Pharmacy; ANA PINEDO, in her official capacity as Member, Oregon Board of Pharmacy; and BRYAN SMITH, in his official capacity as Member, Oregon Board of Pharmacy,

               Defendants.

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AbbVie Inc. v. Drummond*,
No. 25-cv-726, 2025 WL 3048929 (W.D. Okla. Oct. 31, 2025) .................................... *passim*

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ............................................................................................................2

*Ali v. Adamson*,
132 F.4th 924 (6th Cir. 2025) ............................................................................................2

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..........................................................................................................18

*Arizona v. United States*,
567 U.S. 387 (2012) ..............................................................................................23, 24, 32

*Ass'n for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025), *reh'g denied,* No. 24-1019, 2025 WL 2178535
(8th Cir. Aug. 1, 2025) ......................................................................................7, 33, 34, 35

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011) .................................................................................................. *passim*

*Barnett Bank of Marion Cnty., N.A. v. Nelson*,
517 U.S. 25 (1996) ............................................................................................................28

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) ............................................................................................22

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ..........................................................................................................19

*Buckman Co. v. Pls.' Legal Comm.*,
531 U.S. 341 (2001) ..........................................................................................18, 19, 20, 22

*City of Burbank v. Lockheed Air Terminal Inc.*,
411 U.S. 624 (1973) ..........................................................................................................33

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) .........................................................................................3, 22

*Crandall v. Nevada*,
73 U.S. (6 Wall.) 35 (1867) ..............................................................................................22

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ................................................................... *passim*

*Eli Lilly & Co. v. Kennedy,*
  No. 24-cv-03220, 2025 WL 1423630 (D.D.C. May 15, 2025) ............................ 29, 30, 31, 32

*Forest Park II v. Hadley,*
  336 F.3d 724 (8th Cir. 2003) ................................................... 20, 21, 29

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
  505 U.S. 88 (1992) .......................................................................... 28

*Int'l Paper Co. v. Ouellette,*
  479 U.S. 481 (1987) .............................................................. 23, 27, 28

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) .......................................................................... 2

*Nat'l Pork Producers Council v. Ross,*
  598 U.S. 356 (2023) ................................................................... 33, 34

*Novartis Pharms. Corp. v. Johnson,*
  102 F.4th 452 (D.C. Cir. 2024) .................................................... *passim*

*Okla. Tax Comm'n v. Jefferson Lines, Inc.,*
  514 U.S. 175 (1995) ......................................................................... 33

*Okla. Tax Comm'n v. Tex. Co.,*
  336 U.S. 342 (1949) ......................................................................... 22

*Osborn v. Bank of the U.S.,*
  22 U.S. (9 Wheat.) 738 (1824) ......................................................... 22

*Pharm. Rsch. & Mfrs. of Am. v. Morrisey,*
  760 F. Supp. 3d 439 (S.D. W. Va. 2024) .......................................... *passim*

*Pharm. Rsch. & Mfrs. of Am. v. Walsh,*
  538 U.S. 644 (2003) ......................................................................... 34

*Regan v. Tax'n With Representation of Wash.,*
  461 U.S. 540 (1983) .......................................................................... 2

*Sanofi Aventis U.S. LLC v. HHS,*
  58 F.4th 696 (3d Cir. 2023) ............................................... 2, 4, 13, 17

*South Carolina v. Baker,*
  485 U.S. 505 (1988) ......................................................................... 19

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT** – Page ii

*South Dakota v. Dole*,
  483 U.S. 203 (1987)................................................................................2

*Sperry v. Florida ex rel. Fla. Bar*,
  373 U.S. 379 (1963)..............................................................................19

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)..............................................................................33

*Styczinski v. Arnold*,
  46 F.4th 907 (8th Cir. 2022)................................................................35

*United States v. Washington*,
  596 U.S. 832 (2022)...........................................................................3, 19

*Wis. Dep't of Indus., Labor & Human Rels. v. Gould, Inc.*,
  475 U.S. 282 (1986)..........................................................................28, 32

## STATUTES

42 U.S.C.
  § 256b...................................................................................1, 3, 16, 19
  § 256b(a)(1) ........................................................................... *passim*
  § 256b(a)(4) ....................................................................................8, 24
  § 256b(a)(5) ...............................................................8, 21, 24, 29, 32
  § 256b(d) .........................................................................................6, 16, 24
  § 256b(d)(1)(B)(i)(IV)....................................................................16, 31
  § 256b(d)(3)(A)................................................................................16, 29
  § 1320f-3(a) .....................................................................................14, 30
  § 1396r-8(a)(1)...................................................................................7, 20

Minn. Stat. § 62J.842 subd. 1..............................................................34, 35

Or. Rev. Stat. §§ 180.060(1)(a)-(d).........................................................18

Pub. L. No. 102-585, § 602, 106 Stat. 4,943, 4,967 (1992)....................20

Pub. L. No. 111-148, §§ 7101-02, 124 Stat. 119, 821-27 (2010)............20

## RULES & REGULATIONS

Fed. R. Civ. P. 56...................................................................................1, 18

42 C.F.R. § 10.21(a)(1)..............................................................................32

61 Fed. Reg. 43,549 (Aug. 23, 1996)....................................................8, 24

61 Fed. Reg. 65,406 (Dec. 12, 1996).........................................................29

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT** – Page iii

63 Fed. Reg. 35,239 (June 29, 1998) ............................................................................30

89 Fed. Reg. 28,643 (Apr. 19, 2024) ....................................................................21, 32

90 Fed. Reg. 36,163 (Aug. 1, 2025).................................................................. *passim*

# TABLE OF CONTENTS

LOCAL RULE 7-1 CERTIFICATION ..................................................................1

MOTION...........................................................................................................1

INTRODUCTION ..............................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................7

    I.    The Federal 340B Drug Pricing Program ..............................................7

        A.    Congress Creates A Comprehensive Law But Contract Pharmacies Barge In................................................................................................7

        B.    Manufacturers Attempt To Curb Abuse ..................................10

            1.    Contract Pharmacy Policies .........................................10

            2.    340B, The IRA, And Rebate Models............................14

        C.    The Supreme Court Concludes The Federal Enforcement Scheme Is Exclusive............................................................................16

    II.    House Bill 2385 ...................................................................................16

LEGAL STANDARD.......................................................................................18

ARGUMENT ...................................................................................................18

    I.    H.B. 2385 IS PREEMPTED .................................................................18

        A.    Oregon Cannot Single Out A Federal Program For Special Regulation.................................................................................18

        B.    H.B. 2385 Is Also Field And Conflict Preempted Under Traditional Principles.................................................................23

            1.    H.B. 2385 Intrudes On An Exclusively Federal Field ..................24

            2.    H.B. 2385 Conflicts With The Federal Regime............................27

                a.    H.B. 2385 Impermissibly Expands Federal 340B Obligations ........................................................................27

                b.    H.B. 2385 Unlawfully Limits Access To Claims Data ...................................................................................29

c.   H.B. 2385 Impermissibly Seeks To Outlaw The Rebate Model ................................................................30

d.   H.B. 2385 Conflicts With The Federal Enforcement Regime ..............................................................31

II.   H.B. 2385 VIOLATES THE CONSTITUTION'S BAR ON EXTRATERRITORIAL REGULATION ..........................................33

CONCLUSION ........................................................................36

## LOCAL RULE 7-1 CERTIFICATION

Counsel for Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") certifies that the parties made a good faith effort to resolve the dispute through telephone and email correspondence, including a telephone conference on October 22, 2025, regarding the subject of this motion.  The Parties were unable to resolve the issues and Defendants oppose the motion for summary judgment.

## MOTION

Pursuant to Federal Rule of Civil Procedure 56, PhRMA respectfully moves the Court for judgment in its favor on its claims that Oregon's House Bill 2385 is preempted and violates the U.S. Constitution's prohibition on extraterritorial regulation.  There is no genuine dispute as to any material fact, and PhRMA is entitled to judgment as a matter of law.

This motion is supported by the Memorandum below, the Hoerster, Stansel, O'Harra, and Janco declarations, and supporting exhibits, and pleadings on file in this case.

## INTRODUCTION

This case is about Oregon's effort via House Bill 2385 ("H.B. 2385") to alter the terms of participation in the federal 340B Drug Pricing Program, 42 U.S.C. § 256b ("340B").  Multiple courts have recognized that similar state laws are likely preempted because they directly target and conflict with the terms of the federal 340B program.  *AbbVie Inc. v. Drummond*, No. 25-cv-726, 2025 WL 3048929, at \*5-8 (W.D. Okla. Oct. 31, 2025) (preliminarily enjoining similar state law as likely preempted); *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 453-60 (S.D. W. Va. 2024) (same).  That is true of Oregon's law as well.

340B is a creature of Congress's Spending Power.  "Through Medicare and Medicaid, [the federal government] pays for almost half the annual nationwide spending on prescription drugs."

*Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023).  The federal government thus has extraordinary leverage to use the promise of federal funding under those programs to induce drug manufacturers to agree to obligations it could not impose on them directly.  And Congress uses that market power to enlist manufacturers "to subsidize healthcare."  *Id.*  As a condition of reimbursement under Medicare Part B and the federal share of Medicaid, Congress requires manufacturers to sign a federal agreement to offer certain drugs at strikingly low prices— sometimes as low as pennies per unit—to fifteen enumerated types of healthcare providers ("covered entities"), which then resell those drugs to their patients at higher prices.  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 455-58 (D.C. Cir. 2024).  In this way, the federal government engages drug manufacturers to advance the federal interests that underlie the 340B program.

Congress could not do this outside the terms of a federal spending program.  In any other context, a law (federal or state) that simply compelled private parties to sell their property at confiscatory prices would raise serious constitutional concerns.  But "Congress may 'regulate where it otherwise could not'—beyond its enumerated powers, in other words—by imposing conditions on federal funds[,]" provided the recipients "consent to the bargain."  *Ali v. Adamson*, 132 F.4th 924, 930-31 (6th Cir. 2025); *see also, e.g.*, *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 545 (1983).[1]  And that is precisely what Congress has done by making participation in the 340B program one of the "condition[s] of participating in Medicare Part B and Medicaid," *Novartis*, 102 F.4th at 455, that "define the limits of th[os]e government spending program[s,]" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

---

[1] Conditions must also bear a nexus to the program enacted, and the inducement must not be coercive.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581-82 (2012); *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

**PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT** – Page 2

Oregon's statute is not a law of general applicability; it is targeted *only* at the federal 340B program, and *only* at manufacturers who participate in that program as one of the conditions on their eligibility to receive federal Medicare and Medicaid funding.  42 U.S.C. § 256b(a)(1); H.B. 2385 § 1(1)(c) (defining "340B drug" to mean "a drug that has been subject to an offer of a reduced price by a manufacturer pursuant to 42 U.S.C. 256b").  In other words, H.B. 2385 is directly aimed at, and parasitic to, 340B—and 340B alone.  The statute attempts to impose new obligations on manufacturers who participate in 340B by compelling them to sell their drugs at the federal 340B price in circumstances where federal law does not require them to do so, and they would not do so but for Oregon's law.  *Drummond*, 2025 WL 3048929, at *5-6.  In fact, Oregon purports to impose obligations that federal courts repeatedly have held *cannot* be imposed by the federal agency charged with overseeing the 340B program, the U.S. Department of Health and Human Services ("HHS").  By radically expanding the obligations of parties who participate in a federal program that HHS must oversee, Oregon saddles HHS with additional burdens too.

Under the Supremacy Clause of the U.S. Constitution, a state law cannot modify a federal program in this manner.  A long line of Supreme Court cases, including one decided just a few Terms ago, holds that states cannot "singl[e]" out those "with whom [the federal government] deals" "for less favorable treatment" or "regulate[] them unfavorably on some basis related to their governmental status" unless Congress "clearly and unambiguously authorize[s]" them to do so. *United States v. Washington*, 596 U.S. 832, 838-40 (2022); *see also, e.g.*, *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025).  Nothing in the federal 340B statute even hints that Congress empowered states to impose their own obligations on participants, driving up HHS's regulatory obligations and burdens in the process.  H.B. 2385 is invalid for that reason alone.

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT** – Page 3

In fact, the unique features of the 340B program demonstrate why H.B. 2385 not only impermissibly singles out federal partners for disfavored treatment, but also intrudes on and conflicts with Congress's regulation of this exclusively federal field.    First, H.B. 2385 fundamentally alters the nature of manufacturers' 340B obligations (and thus the bargain between manufacturers and the federal government) by compelling manufacturers to sell drugs at the 340B price in circumstances where Congress does not require them to do so.    *Drummond*, 2025 WL 3048929, at *6.  Congress required that manufacturers "offer" to sell certain drugs at reduced 340B federal prices to the specified beneficiaries of the 340B federal subsidy—the "covered entities."    42  U.S.C.  § 256b(a)(1).    Two  federal  appellate  courts  have  made  clear  that manufacturers do *not* have to offer (let alone agree) to provide 340B-priced drugs to all of a covered entity's contract pharmacies if the covered entity refuses to agree to manufacturers' contract pharmacy conditions.  *Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06.  The 340B program instead leaves manufacturers free to attach reasonable conditions to their 340B offers, including restrictions limiting the number of contract pharmacies to which manufacturers will provide 340B-priced drugs and requirements that covered entities submit claims data for 340B-priced drugs. *Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06.  H.B. 2385 displaces that framework by outlawing the very same conditions that federal courts have repeatedly affirmed manufacturers are free to impose, thereby compelling manufacturers to sell their drugs at 340B prices when Congress does not require them to do so.

Oregon officials recognized that H.B. 2385 would expand the 340B program far beyond the bounds Congress set for it.  One Oregon Representative, when opposing H.B. 2385, stated outright that the bill "interferes with a federal program" and that he did not believe Oregon "should

be attempting to usurp federal government's authority with respect to [the 340B] program."[2]  The representative also noted that the bill will "interfere with contractual arrangements in that program."[3]  Another representative remarked in a question that, through H.B. 2385, Oregon would be "expanding" the 340B program.[4]  These statements alone confirm that the law is preempted.

Second, H.B. 2385's restriction on the collection of claims data also conflicts with 340B. Claims data is key data about the specific prescriptions that may or may not qualify for 340B pricing under federal law.  Such data is "readily available" to healthcare providers, widely utilized in healthcare billing, and minimally burdensome to provide.[5]  Claims data is also essential for manufacturers to invoke the federal statutory remedies process under the federal 340B program. And a federal court has held that manufacturers can lawfully require provision of claims data as a condition in their offer of 340B-priced drugs.  *Novartis*, 102 F.4th at 462-64.  Yet, H.B. 2385 conceals this critical data from manufacturers by prohibiting them from requiring it as a condition on selling their drugs to a covered entity (or a contract pharmacy acting on its behalf) at the 340B price for dispensing to the covered entity's patients at a contract pharmacy.  H.B. 2385 § 1(2)(b). That directly frustrates the operation of remedial rights Congress expressly made available to manufacturers under 340B.  *Drummond*, 2025 WL 3048929, at *7-8 (holding similar state law conflicts with the federal enforcement regime by cutting off access to the data needed to access it);

---

[2]  Hr'g Audio at 16:37-16:46, S. Comm. on Health Care – May 6, 2025 Hr'g, https://tinyurl.com/3d32bekf.

[3]  *Id.* at 16:46-16:53.

[4]  Hr'g Audio at 3:25:00-3:25:10, H. Comm. on Behavioral Health & Health Care – Mar. 11, 2025 Hr'g, https://tinyurl.com/24mmfjde.

[5]  *See* 90 Fed. Reg. 36,163, 36,165 (Aug. 1, 2025) ("readily available"); *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 463 (D.C. Cir. 2024) (minimal burden); *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 451 (S.D. W. Va. 2024) (noting use of claims data is "widespread").

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** – Page 5

*Morrisey*, 760 F. Supp. 3d at 450-53. And it expands the obligations of HHS because the agency must now police a far greater universe of transactions—without the ability of manufacturers to detect and identify potential statutory violations.

Third, H.B. 2385 appears to outlaw HHS's recent Rebate Model Pilot Program, which uses claims data and facilitates compliance with 340B and another federal law, the Inflation Reduction Act ("IRA"). H.B. 2385's bar on "restrict[ing]" or "interfer[ing]" with the acquisition or delivery of a 340B-priced drug would appear to prohibit manufacturers from utilizing "rebate models," H.B. 2385 § 1(2)(a), despite rebates being explicitly permitted under the federal statute and the federal Rebate Model Pilot Program.

Fourth, H.B. 2385 conflicts with 340B's exclusive federal administration and enforcement regime. *Drummond*, 2025 WL 3048929, at *5-8; *Morrisey*, 760 F. Supp. 3d at 453-61. As the Supreme Court made clear in *Astra USA, Inc. v. Santa Clara County*, Congress intended that the 340B program would be administered exclusively by HHS, on a "uniform, nationwide basis[,]" with enforcement "centralized" in the federal government. 563 U.S. 110, 119-22 (2011); *see* 42 U.S.C. § 256b(d). The Supreme Court warned that splitting the enforcement burden among multiple decisionmakers would risk "conflicting adjudications[,]" endangering the program. *Astra*, 563 U.S. at 120. But H.B. 2385 empowers state decisionmakers to enforce Oregon's requirements, addressing *the same conduct* already covered by the federal program's exclusive remedial measures. *See Drummond*, 2025 WL 3048929, at *7-8; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("[C]onflict is imminent when[ever] two separate remedies are brought to bear on the same activity[.]"). These state enforcement measures directly conflict with HHS's exclusive authority and present the precise risk of conflicting adjudications *Astra* identified. 563 U.S. at 119-22; *Drummond*, 2025 WL 3048929, at *7-8. If not invalidated, H.B. 2385, along

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT** – Page 6

with similar laws in dozens of other states, will prevent HHS from managing the 340B program on a uniform nationwide basis.  And with conflicting requirements from dozens of different states, the 340B program will no longer be uniform or federal.

H.B. 2385 also violates the Constitution's prohibition on extraterritorial regulation. Almost all pertinent manufacturer transactions occur *extraterritorially*, outside Oregon, between out-of-state manufacturers and out-of-state distributors, which in turn handle sales of drugs to covered entities and pharmacies (some of which are located in Oregon).  As the Eighth Circuit recently held, *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025), *reh'g denied,* No. 24-1019, 2025 WL 2178535 (8th Cir. Aug. 1, 2025), laws that directly regulate out-of-state drug transactions are unconstitutional.  H.B. 2385 is just such a law:  It regulates wholly out-of-state transactions between out-of-state manufacturers, on the one hand, and out-of-state distributors, on the other.  That is impermissible, as *Accessible Medicines* held in indistinguishable circumstances.

PhRMA respectfully requests that the Court issue judgment in its favor.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    THE FEDERAL 340B DRUG PRICING PROGRAM

#### A.   Congress Creates A Comprehensive Law But Contract Pharmacies Barge In

To receive federal Medicaid or Medicare Part B reimbursements, manufacturers must agree to participate in the federal 340B program and sign an agreement laying out the terms of that participation.  42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1).  The federal statute and federal agreement require that the manufacturer "shall offer" to sell drugs at reduced 340B prices to covered entities, which are defined via statutory list.  *Id.* §§ 256b(a)(1), (4).  Because manufacturer participation in Medicare, Medicaid, and 340B rise and fall together, Congress needed to ensure that the benefits

of participation in Medicare and Medicaid outweigh the burdens of 340B participation. That is why, among other things, Congress narrowly circumscribed the entities eligible for reduced prices. As relevant here, no pharmacies appear on that statutory list of covered entities. 42 U.S.C. § 256b(a)(4).

Congress also tried to prevent the inevitable temptation to abuse the limited subsidy. To that end, in 42 U.S.C. § 256b(a)(5), Congress prohibited a covered entity from requesting a "duplicate discount[]" by seeking a rebate under Medicaid for a 340B-priced drug (known as the "duplicate discount[]" provision), or from reselling or transferring a 340B-priced drug to any person other than a "patient" of that entity (known as the "diversion" provision). *Id.* § 256(a)(5), (d)(2)(A).

In 1996, HHS addressed whether a covered entity *without* an in-house pharmacy could contract with one—but only one—outside pharmacy to dispense 340B-priced drugs to its patients. The agency reasoned that, if such a pharmacy was contractually an "agent" of the covered entity (a "contract pharmacy"), and the covered entity retained title to the drugs at all times before they were dispensed to its patients, then such an arrangement would not violate the diversion provision. 61 Fed. Reg. 43,549, 43,550, 43,555 (Aug. 23, 1996). Concerned about the risk of diversion, however, HHS permitted each covered entity to have a maximum of *one* contract pharmacy. *Id.* at 43,555.

These requirements applied for 14 years, until HHS changed its guidance to allow each covered entity to use an *unlimited* number of contract pharmacies. *Novartis*, 102 F.4th at 457-58. Thereafter, the number of contract pharmacies exploded, as (predictably) did the number of claims for 340B pricing—meaning the cost to manufacturers skyrocketed, even though the patient population of covered entities eligible for 340B pricing did not expand at anything approaching

the same rate. *Id.* By 2023, the number of contract pharmacy arrangements had risen to 33,000 compared to 1,300 in 2010. GAO, GAO-18-480 at 10 (2018), Ex. 4; S. Comm. on Health, Educ., Lab., & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 3 (Apr. 2025), Ex. 5. As the Government Accountability Office ("GAO") and the HHS Inspector General ("OIG") have explained, many for-profit pharmacies—including the nation's largest chains—recognized that if they could insert themselves into 340B, they could acquire drugs at 340B prices, sell them at or near full price, and pocket a portion as profit. *Novartis*, 102 F.4th at 456-58; CVS Health Corporation, Annual Report (Form 10-K) (February 12, 2025), Ex. 6; Walgreens Boots Alliance, Annual Report (Form 10-K) (October 15, 2024), Ex. 7.

This explosion ballooned 340B's size and dramatically increased the risk of abuse. In a GAO study, contract pharmacies accounted for nearly two-thirds of unlawful diversion violations. Ex. 4 at 44-45 ("The expansion of contract pharmacies … increases potential … risks related to diversion and duplicate discounts."); GAO, GAO-20-108 at 5 (2019), Ex. 8; GAO, GAO-11-836 at 28 (2011), Ex. 9; GAO, GAO-20-212 (2020), Ex. 10. Overall, "growth in the use of contract pharmacies has amplified the complexity of 340B Program oversight, particularly regarding patient eligibility, drug diversion, and duplicate discounts." Ex. 5 at 3.

The opportunity for abuse is even more acute given most contract pharmacies' use of the product "replenishment model," under which contract pharmacies dispense drugs from their general inventories to all customers. *Id.* at 31; *Examining Oversight Reports on the 340B Drug Pricing Program*, 115th Cong. 11-12 (2018), Ex. 11; Walgreens 340B Contract Pharmacy Services Agreement, *Sanofi Aventis U.S., LLC v. HHS*, No. 24-cv-1603 (D.D.C. Nov. 29, 2024), ECF No. 24-2, Ex. 12; 340B Contract Pharmacy Services Agreement – ReCept Pharmacy, Dallas County (Oct. 1, 2019), https://tinyurl.com/28xafrt2, Ex. 13; Monterey and CVS Pharmacy, Inc.

Pharmacy Services Agreement, County of Monterey (Oct. 1, 2019), https://tinyurl.com/2kpdrxe2, Ex. 14.  On the back end, they use undisclosed algorithms that purport to retroactively identify customers that may have some relationship to a covered entity, and they then restock their general inventories with 340B-priced drugs based on that information.  Ex. 11 at 11; Ex. 4 at 2; *Novartis* at 457-58; Pedley Decl. ¶¶ 5-11, Ex. 15.  This black-box system creates more opportunities for diversion.  Ex. 11 at 11-12; HHS, *Mem. Report: Contract Pharmacy Arrangements in the 340B Program* 16 (2014), Ex. 16.  It also results in greater profits, incentivizing "catalog[ing] as many prescriptions as possible as eligible for the discount."  *Novartis*, 102 F.4th at 457-58.  With the list price value of 340B purchases reaching $147.8 billion in 2024, 340B is now the second largest federal government pharmaceutical program.  Adam Fein, Drug Channels News Roundup (June 24, 2025), Ex. 17; Rory Martin & Harish Karne, The Size & Growth of the 340B Program in 2024 1, Ex. 18; GAO, GAO-23-106095 at 16-17 (2023), Ex. 19.

Unfortunately, these price reductions usually are not passed on to patients because purported patients of covered entities are identified after they have already left the pharmacy. *Morrisey*, 760 F. Supp. 3d at 447; Rory Martin & Kepler Illich, Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies? 3, 12, Ex. 20.

### B.  Manufacturers Attempt To Curb Abuse

#### 1.  Contract Pharmacy Policies

Eventually, drug manufacturers (including PhRMA members) concerned with illegal diversion and duplicate discounts associated with contract pharmacies individually implemented their own policies meant to identify and address these problems—in particular, by limiting the number of contract pharmacies a covered entity can use, and by requiring covered entities to provide claim data. *Novartis*, 102 F.4th at 457-58.  Through these revisions to their offers, PhRMA

members informed covered entities that they would not sell drugs to covered entities at 340B prices unless covered entities agreed to those conditions. *Novartis*, 102 F.4th at 457-58.

Here is how those policies generally work: Drugs—including 340B-priced drugs—follow a multistep path from manufacturer to patient. PhRMA's members sell their drugs—including drugs ultimately sold at 340B prices—to distributors. Stansel Decl. ¶¶ 8-10, Ex. 1; O'Harra Decl. ¶¶ 17-29, Ex. 2; Janco Decl. ¶¶ 8-14, Ex. 3. The vast majority of these sales are to three major distributors: Cardinal Health, Cencora, and McKesson. Ex. 2 ¶10. PhRMA's members and the major distributors are all headquartered and incorporated outside Oregon, and PhRMA's members ship their drugs to major distributor warehouses located outside Oregon. Ex. 1 ¶¶ 3-10; Exs. 21-24. Pharmacies and healthcare providers purchase PhRMA's members' drugs from the major distributors, which ship these drugs nationwide. Ex. 1 ¶ 10; Ex. 2 ¶¶ 10-11; Ex. 3 ¶¶ 15-16. According to federal data, almost half of contract pharmacies serving Oregon-based covered entities are outside Oregon, many located far from Oregon in states including Florida, Texas, Michigan, and New York, among others.[6]

The contract pharmacy and claims data conditions in PhRMA members' individual contract pharmacy policies generally are implemented in the following way: When a manufacturer includes these conditions on its offer of 340B-priced drugs, a drug distributor will configure the conditions into the programming logic of the distributor's platform that covered entities and their contract pharmacies use to purchase the manufacturer's drugs through the 340B program. Ex. 1 ¶¶ 10, 14-17; Ex. 2 ¶¶ 22-28; Ex. 3 ¶¶ 12-14. This programming logic also blocks contract pharmacies that are ineligible (i.e., when the relevant covered entity has not accepted a

---

[6] *See* U.S. Health Resources and Services Administration, 340B OPAIS Database, https://tinyurl.com/3tbhakee.

manufacturer's contract pharmacy policy) from purchasing 340B-priced drugs. Ex. 2 ¶¶ 25-28. If a covered entity designates a contract pharmacy consistent with the manufacturer's 340B contract pharmacy policy and accedes to the manufacturer's conditions, the manufacturer includes the designated contract pharmacy on the list of eligible contract pharmacies that it provides to distributors. *Id.* ¶ 25. The distributors then configure their systems to allow the contract pharmacies on the manufacturer's list to access 340B pricing and block those not on the list from purchasing the drug at the 340B price. *Id.*

Accordingly, if a covered entity does not accept the reasonable conditions of a PhRMA member's contract pharmacy policy, it (or a contract pharmacy acting on its behalf) cannot purchase drugs through the 340B program for dispensing to the cover entity's patients at a contract pharmacy. *Id.* ¶¶ 22-28; Ex. 3 ¶¶ 12-14. A covered entity that does not accept a manufacturer's conditions, and any affiliated contract pharmacies, can still purchase and acquire the same drugs from the manufacturer, so long as the pharmacies qualify under relevant laws and requirements to receive the drugs. They will just have to pay commercial prices instead of the reduced 340B price. Ex. 2 ¶¶ 24, 29; Ex. 3 ¶¶ 9, 14.

The permissibility of these very conditions has already been litigated. In 2021, HHS issued a series of violation notices to drug manufacturers, including some PhRMA members, claiming that these conditions violate federal law, and seeking to compel them to offer and deliver 340B-priced drugs to *all* covered-entity contract pharmacies.[7] Litigation followed, with key decisions in the U.S. Courts of Appeals for the Third and D.C. Circuits. The central legal question in each of these cases was whether the federal government could mandate an "unlimited" contract

---

[7] AstraZeneca Letter, Ex. 25; Lilly Letter, Ex. 26; Novartis Letter, Ex. 27; Novo Nordisk Letter, Ex. 28; Sanofi Letter, Ex. 29.

**PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT** – Page 12

pharmacy delivery requirement.  Both Circuits said "no."

In *Sanofi*, the Third Circuit explained that Congress contemplated "one-to-one" relationships between manufacturers and covered entities in the 340B program, "without mixing in a plethora of pharmacies."  58 F.4th at 704-05.  No language in the federal statute expressly obligates manufacturers to deliver 340B-priced drugs to contract pharmacies, and no obligation to deliver to an unlimited number of contract pharmacies can be inferred from the statutory text or structure.  *Id.* at 703-06.  *Sanofi* recognized that there may be some narrow circumstances in which federal law requires a manufacturer to deliver to a contract pharmacy—for example, if a covered entity does not have an in-house pharmacy and thus cannot "accept" a manufacturer's 340B offer without having **one** contract pharmacy to dispense the drugs.  *Id.*  But the court concluded that Congress did not empower HHS to require manufacturers to deliver 340B-priced drugs to any and all contract pharmacies of a covered entity's choosing.  *Id.* at 705.

In *Novartis*, the D.C. Circuit agreed with *Sanofi* that the 340B statute could not support HHS's *unlimited* contract pharmacy mandate.  102 F.4th at 460-64.  And the court went a step further, holding that manufacturers can lawfully condition their federal offers on a "one contract pharmacy" delivery limitation and the provision of "claims data."  *Id.*  *Novartis* reasoned that Congress left manufacturers discretion to structure their 340B offers under 42 U.S.C. § 256b(a)(1), so long as those offers remain "bona fide," reasonable, and consistent with the federal statute.  *Id.* (describing manufacturers' ability to put certain reasonable conditions on their federal 340B offers).  The two conditions at issue—a "one contract pharmacy" limitation and a requirement to provide "claims data"—met that test.  *Id.*

Once such an offer is made, the manufacturer's "shall offer" obligations are discharged.  *Novartis*, 102 F.4th at 460-64.  If such an offer is not accepted by a covered entity, there is no sale

of a 340B-priced drug.  *See id.*; Ex. 2 ¶¶ 22-28; Ex. 3 ¶ 14.

 2. <u>340B, The IRA, And Rebate Models</u>

Recently, HHS also launched a Rebate Model Pilot Program, permitting specific conditions on 340B offers—including claims data requirements and 340B price reductions through after-purchase rebates, rather than pre-purchase discounts—by certain manufacturers to assist in implementing the IRA.  *See* 90 Fed. Reg. at 36,163-65.  The IRA establishes the Medicare Drug Price Negotiation Program, under which HHS is to "negotiate" with manufacturers "maximum fair prices" for certain drugs.  42 U.S.C. § 1320f-3(a).  Manufacturers must provide access to selected drugs at the so-called maximum fair prices, except that they need not provide access to the maximum fair prices when such selected drugs are 340B-eligible and the 340B price is lower than the maximum fair price.  *Id.* § 1320f-2(d).  That is, manufacturers need not provide both the 340B price and "maximum fair price" on the same selected drug.  *Id.*  To avoid duplicate discounting, this scheme necessarily requires identifying when a drug subject to the maximum fair price is dispensed as a 340B drug.

The Centers for Medicare and Medicaid Services ("CMS") has issued final IRA guidance for avoiding duplicate discounting under the Medicare Drug Price Negotiation Program.  Under that guidance, a manufacturer bears the burden of determining and verifying whether a "claim for the selected drug is a 340B-eligible claim."  CMS, Medicare Drug Pricing Negotiation Final Guidance 60, Ex. 30; CMS, Medicare Drug Price Negotiation Program Draft Guidance 48 (A manufacturer must "indicate[] that the claim for [a] selected drug is a 340B-eligible claim and the 340B ceiling price is lower than the [maximum fair price] for the selected drug."), Ex. 31.

On August 1, 2025, HHS issued guidance discussing one mechanism for qualifying drug manufacturers to provide the 340B ceiling price:  So-called "rebate models," which involve

collecting claims data and then using retroactive rebates, rather than upfront discounting, to supply the 340B price. *See* 90 Fed. Reg. at 36,163-65. As the notice explains, manufacturers, including some PhRMA members, have sought to use rebate models, including claims data collection as part of the models, to detect and prevent duplicate discounts (including duplicate discounts under the IRA) and diversion. *Id.* The announcement explains HHS's view that it has authority over and regulates terms of 340B participation, including the ability to use such rebate models. *Id.* In addition to expressly permitting the use of rebates for qualifying manufacturers, the announcement also makes clear that participating manufacturers can demand certain claims data as part of their rebate models to guard against duplicate discounting. *Id.* at 36,164.

Several of PhRMA's members, including Bristol Myers Squibb, AstraZeneca, Merck Sharp Dohme, Boehringer Ingelheim, Novo Nordisk, and Novartis are now approved to participate in the Rebate Model Pilot Program for their drugs subject to the IRA. HHS, 340B Rebate Model Pilot Program, Ex. 32. As part of that Program, covered entities will purchase those drugs at what is known as the wholesale acquisition cost (typically the manufacturer's list price for the drug, excluding any rebates or discounts). Covered entities will then submit claims data to the manufacturer if they wish to seek payment of a 340B rebate, which will lower the net cost of the product to at least the 340B ceiling price. *See* 340B ESP Claims Data Fields, Ex. 33. To effectuate the rebate, manufacturers may require the following pharmacy claims data fields: date of service, date of prescribing, Rx number, fill number, national drug code, quantity dispensed, prescriber and service provider ID, and 340B ID, among other things. *See* Ex. 32. Manufacturers may also require medical claims data fields, including date of service, national drug code, quantity, rendering physician ID, service provider ID, 340B ID, health plan name, health plan ID, and other information. Ex. 1, ¶ 16.

**PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT** – Page 15

**C.  The Supreme Court Concludes The Federal Enforcement Scheme Is Exclusive**

The administration and enforcement of 340B lie solely in the federal government's hands:

Unlike some federal healthcare programs, 340B is not an exercise in so-called "cooperative

federalism."  The Supreme Court has—unanimously—made this clear.  *Astra*, 563 U.S. at 119-21.

Congress amended the 340B statute in 2010.  *Id.* at 116-17.  In its amendments, Congress created

a new comprehensive and exclusive remedies process, *see* 42 U.S.C. § 256b(d), with several

unique features.  The process is required to be iterative, with informal dispute resolution, corrective

actions, audits, adjustments, and refunds all preceding any assessment of civil penalties.  *Id.*

§ 256b(d)(1)(B)(v)-(vi); *Astra*, 563 U.S. at 121-22.  Issues related to 340B compliance and

obligations raised by covered entities or manufacturers are to be resolved through Administrative

Dispute Resolution ("ADR"), which is administered by HHS.  42 U.S.C. § 256b(d)(3)(A).  HHS

decisions on these issues are final, subject only to federal court review.  *Id.* § 256b(d)(3)(C).

**II.    HOUSE BILL 2385**

H.B. 2385 expressly regulates participation in the federal 340B program; indeed,

H.B. 2385 has no effect unless a manufacturer participates in 340B.  *See* H.B. 2385 § 1(1)(c)

(defining "340B drug" to mean "a drug that has been subject to an offer of a reduced price by a

manufacturer pursuant to 42 U.S.C. 256b").  H.B. 2385 seeks to regulate and change the federal

program by:  (1) altering the terms of the federal 340B offer manufacturers must make under

Section (a)(1) of the federal statute; and (2) compelling drug manufacturers to sell 340B-priced

drugs even when federal law does not require those sales.  *Id.* § 1(2)(a).  H.B. 2385 thus expands

the scope of the 340B subsidy manufacturers must provide as a condition of receiving federal funds

under Medicare and Medicaid.

H.B. 2385's prohibition is explicitly directed at manufacturers who participate in the 340B

program. H.B. 2385 instructs that "[a] manufacturer or third party on behalf of a manufacturer may not [d]eny, restrict, prohibit or otherwise interfere directly or indirectly with the acquisition of a 340B drug, delivery of a 340B drug to or dispensation of a 340B drug by a pharmacy that has contracted with a covered entity to receive and dispense 340B drugs on behalf of the covered entity in this state[.]" *Id.* § 1(2)(a). H.B. 2385 also provides that "[a] manufacturer or third party on behalf of a manufacturer may not [r]equire, either directly or indirectly, a covered entity to submit a claim or utilization review data as a condition for the acquisition of a 340B drug by, delivery of a 340B drug to or dispensation of a 340B drug by a pharmacy that has contracted with a covered entity[.]" *Id.* § 1(2)(b). That is, it requires manufacturers to sell drugs to covered entities (and their contract pharmacies) at 340B prices even when the covered entity refuses to comply with the manufacturer's conditions on the number of contract pharmacies or the provision of claims data—the very same conditions courts have held Congress permitted manufacturers to impose on covered entities as part of a "bona fide" offer. *Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06.

Oregon's law specifically targets 340B-priced drugs for a reason: "[T]he only difference between a '340B drug' and a non-340B drug is … it[s] price"; they are otherwise identical. *Drummond*, 2025 WL 3048929, at *6. Accordingly, H.B. 2385 is not about drug *access*. This is undisputed: PhRMA's members already sell and ship the same drugs at issue to the same pharmacies at commercial or negotiated prices. Ex. 2, ¶ 29; Ex. 3, ¶ 14. All H.B. 2385 does is mandate that PhRMA's members sell those drugs at *340B prices* even when federal law does not require them to do so. The whole and sole point of H.B. 2385 is to impose special obligations on participants in that federal program. And it imposes additional obligations on HHS, too, forcing HHS to police potential duplicate discounts and diversion by covered entities through tens of thousands of pharmacies that are not entitled under federal law to benefit from 340B.

H.B. 2385 provides for civil liability.  The civil remedies include a civil penalty of up to $5,000 per day for each violation.  *See* H.B. 2385, § 2(1).  H.B. 2385 empowers the Attorney General and the Board of Pharmacy to enforce the law.  *Id.* (stating that "[i]n addition to any other liability or penalty provided by law, the State Board of Pharmacy may impose a civil penalty"); Or. Rev. Stat. §§ 180.060(1)(a)-(d).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides a court "shall … grant summary judgment if [the movant shows that] there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## ARGUMENT

### I.    H.B. 2385 IS PREEMPTED

H.B. 2385 is preempted.  The sole point of H.B. 2385 is to impose special obligations on participants in a federal Spending Power program—obligations that intrude on and directly conflict with the federal statute.

### A.  Oregon Cannot Single Out A Federal Program For Special Regulation

H.B. 2385 impermissibly modifies and interferes with a "relationship that originates from, is governed by, and terminates according to federal law."  *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001).  H.B. 2385 is not a generally applicable state law; it applies *solely* and *exclusively* to participants in the federal 340B program.  Only if a manufacturer chooses to participate in that federal program does it have to take on the onerous burdens H.B. 2385 creates. The Supremacy Clause forbids Oregon from singling out participants in a federal program for special regulatory obligations.

**PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT** – Page 18

To begin, H.B. 2385 imposes obligations on drug manufacturers if—and only if—they participate in the federal 340B program. That much is not open to dispute. The law applies only to the sale and distribution of a "340B drug," a term that is defined by reference to participation in the federal 340B program set forth in "42 U.S.C. 256b." H.B. 2385, § 1(1)(c). H.B. 2385 forbids manufacturers that participate in the 340B program from imposing certain conditions and requirements on the provision of their drugs. But the same manufacturer *could* impose those very same conditions and requirements on the very same drugs if it did not participate in the federal 340B program. H.B. 2385 thus targets the federal program exclusively and seeks to expand the privately funded subsidy under it. Indeed, that is the *entire point* of H.B. 2385, and it is exactly why Oregon enacted the law in the first place: Oregon wants contract pharmacies to receive the benefits of the 340B program even though Congress has not included them in the federal program.

The Supreme Court has long and consistently rejected state efforts like H.B. 2385 to target for special disparate regulation "the United States or those with whom it deals." *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). Such discrimination occurs when a state law "singles" out those who contract with the federal government "for less favorable treatment" or "regulates them unfavorably on some basis related to their governmental status." *United States v. Washington*, 596 U.S. 832, 838-40 (2022); *see also Sperry v. Florida ex rel. Fla. Bar*, 373 U.S. 379, 385 (1963) (striking down state law that imposed additional licensing requirements on practicing before the U.S. Patent Office); *cf. Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-13 (1988) (holding that state tort law cannot be used to hold federal contractors liable for design defects in contracted-for military equipment); *Buckman*, 531 U.S. at 347 (holding that state tort law cannot be used to police claims of fraud on a federal agency). That is precisely what H.B. 2385 does: It requires parties to take on special state-law obligations for no other reason than because they participate in a program

that "originates from, is governed by, and terminates according to federal law." *Buckman*, 531 U.S. at 347. Indeed, that describes the 340B program to a T: It is created entirely by federal statute, *see* Pub. L. No. 102-585, § 602, 106 Stat. 4,943, 4,967 (1992); Pub. L. No. 111-148, §§ 7101-02, 124 Stat. 119, 821-27 (2010); it is governed only by federal law and administered exclusively by HHS, *Astra*, 563 U.S. at 119-20; and federal law exclusively dictates who must participate in the program and when, 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1).

That makes H.B. 2385 like the state law held unconstitutional in *Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003). In the 1960s, Congress created a federal spending program to promote low-income housing, under which the Department of Housing and Urban Development ("HUD") "enticed private developers" to build and maintain affordable multi-family housing by offering them loans with below-market interest rates. *Id.* at 728. Those developers received federally subsidized mortgages from HUD and, in exchange, agreed to provide tenants with more affordable housing. *Id.* As part of its efforts to entice participation, HUD left developers free to buy out the mortgage early, thus exiting the federal program and eliminating their obligation to provide pricing concessions to low-income tenants. *Id.* Minnesota disagreed with that decision, so it enacted its own restrictions, making it more difficult for developers who participated to buy out their mortgage and exit HUD's program. *Id.* at 730. The Eighth Circuit struck down the Minnesota law under the Supremacy Clause. *Id.* at 732.

Although the "unique federal laws and programs involved in [the] case ma[d]e it difficult to apply a traditional pre-emption analysis," the court had no difficulty finding the dispute "presents the quintessential case of the Supremacy Clause in action." *Id.* at 731, 732. It began by discarding the presumption against preemption, because states have not traditionally regulated federal programs. *See id.* Then the court explained that "[a] private participant in a federal housing

program who seeks to withdraw from participation pursuant to the provisions of that program …
is being prohibited by a state law from taking the action that the federal government has otherwise
authorized." *Id.* at 731-32.  On top of that, the "effect" of Minnesota's law was to force "the
federal government to continue to provide financial assistance to the participant when both the
federal government and the participant have chosen to end their relationship." *Id.* at 732.  The
state law thus "regulate[d] or restrict[ed] the actions of the federal government under its own
federal program," which violates the bedrock principle that "state statutes may not interfere with
the implementation of a federal program by a federal agency." *Id.*

Like the law in *Forest Park II*, H.B. 2385 unlawfully "regulates or restricts the actions of
the federal government under its own federal program." *Id.*  For one thing, H.B. 2385 upsets the
"delicate balance" that Congress "struck … with the federal 340B Program." *Drummond*, 2025
WL 3048929, at *6.  Oregon's law makes participation in the 340B program—and, by extension,
in Medicaid and Medicare Part B—much more costly for drug manufacturers, because it requires
manufacturers who want to receive federal payments for their drugs under Medicare Part B and
Medicaid to provide 340B prices even when they are not required by federal law to do so.  State
340B laws also expand the obligations of HHS, the federal agency that administers the 340B
program.  HHS must monitor and audit entities that receive 340B-priced drugs even if the entities
only receive the drugs because of a state-law mandate.  *See* 42 U.S.C. § 256b(a)(5)(C); 89 Fed.
Reg. 28,643, 28,644 (Apr. 19, 2024) (HHS conducts audits each year, including of contract
pharmacy arrangements).  H.B. 2385 radically expands the scope of HHS's obligations to police
for diversion and duplicate discounts—not to mention the agency's dispute-resolution
responsibilities.

To be sure, states may require private parties that participate in federal programs to comply

with generally applicable state laws (at least so long as they do not conflict with parties' federal-law obligations or are not otherwise preempted). But states do not traditionally have the power to directly regulate the federal program or relationship itself. It is not just that "no presumption against pre-emption obtains in this" context. *Buckman*, 531 U.S. at 348. States *do not have any power at all* to single out federal spending programs, which implicate uniquely federal interests, for special regulation unless Congress has "clearly and unambiguously authorized" them to do so, *CoreCivic*, 145 F.4th at 321. Indeed, the Supreme Court has held time and again that states may not "control" federal operations by regulating those that contract with the federal government to advance federal objectives. *See Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 786-89, 866-67 (1824); *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 44-45 (1867); *Okla. Tax Comm'n v. Tex. Co*., 336 U.S. 342, 364 (1949); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014) (concluding that state law unconstitutionally regulated federal government because it "replace[d] the federal cleanup standards that Boeing [who was contracted with the federal government] ha[d] to meet to discharge its contractual obligations to [the federal agency] with the standards chosen by the state" and thus "regulate[d] not only [Boeing] but the effective terms of federal contract itself").

These bedrock principles suffice to resolve this case. Because nothing in the federal 340B statute even purports to give states the power to alter the 340 program's terms, H.B. 2385 is far beyond Oregon's authority and is preempted. With H.B. 2385, Oregon seeks to barge into the federal 340B program and contract, impose significant new obligations on manufacturers that change the federal bargain, and impose substantial additional burdens on HHS to boot. These new state-law obligations are directly at odds with the federal program that Congress established, which permits exactly the kind of contract pharmacy and claims data conditions that Oregon forbids.

And by simultaneously adding all manner of additional contract pharmacies to the system through which diversion may occur, Oregon's law saddles HHS with policing obligations over many more transactions, obligations that Congress itself chose not to impose. Indeed, these state provisions purport to prohibit even HHS's own Rebate Model Pilot Program, which utilizes rebates and claims data preconditions. *See* 90 Fed. Reg. at 36,163-65.[8]

H.B. 2385 singles out participants in a federal program for special obligations that the state does not impose on drug manufacturers (or pharmacies) writ large. Because Congress has not authorized states to alter the terms of participation in the federal 340B program, that alone suffices to invalidate Oregon's law under the Supremacy Clause.

### B. H.B. 2385 Is Also Field And Conflict Preempted Under Traditional Principles

H.B. 2385 is also preempted under traditional field and conflict preemption principles. Field preemption exists where (1) Congress's "framework of regulation [is] 'so pervasive'" that Congress has "left no room for the States to supplement it," or (2) where there is a "federal interest … so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Field preemption is especially likely where a state law "diminish[es] the [Federal Government]'s control over enforcement and detract[s] from the integrated scheme of regulation created by Congress." *Id.* at 402. And where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby*, 530 U.S. at 373, or "interferes with the methods by which the federal statute was designed to" achieve those purposes and objectives, it is conflict preempted, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492, 494 (1987) (state law preempted because it would "upset[] the balance of public and private interests so carefully addressed by the

---

[8] PhRMA members are participating in the Rebate Model Pilot Program. Ex. 1, ¶ 16.

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT** – Page 23

[federal statute]").  Field and conflict preemption are not "rigidly distinct": instead, the criteria for both can overlap.  *Crosby*, 530 U.S. at 372 n.6.

And, as previously explained, there is no presumption against preemption when it comes to laws that exclusively target participants in a federal spending program.  *See supra* at 20-22. H.B. 2385 is both field and conflict preempted.

1.  H.B. 2385 Intrudes On An Exclusively Federal Field

The 340B statute provides a comprehensive set of instructions for how HHS must administer the program and enforce its requirements.  The federal statute addresses precisely: (1) which entities can be eligible for 340B reduced prices, 42 U.S.C. § 256b(a)(4); (2) which prescriptions are and are not eligible for price reductions, *id.* § 256b(a)(5); (3) under which circumstances manufacturers must offer 340B drug pricing, and what conditions those offers may and may not include through the bona fide offer requirement, *id.* § 256b(a)(1); and (4) a highly detailed set of iterative enforcement measures to address issues that arise under the program, *id.* § 256b(d); *Novartis*, 102 F.4th at 460-64.  The field governed by this federal program is defined by its specific provisions regulating each of its key functions, including eligibility for reduced pricing, the content of a manufacturer's 340B offer, and the administration and enforcement of the statute's requirements.  Field preemption applies where a state law "diminish[es] the [federal government]'s control over enforcement and detract[s] from the integrated scheme of regulation created by Congress." *Arizona*, 567 U.S. at 402.  And the field here specifically includes how the federal program addresses contract pharmacies.  *Novartis*, 102 F.4th 460-64; 61 Fed. Reg. at 43,550, 43,555.

The Supreme Court's *Astra* decision demonstrates how Congress intended the 340B program to operate:  as a single, nationally uniform program with a sole federal agency

decisionmaker (subject to review by federal courts). 563 U.S. at 121-22; *Drummond*, 2025 WL 3048929, at *7. The Supreme Court specifically warned that permitting multiple decisionmakers to address how the 340B program operates could risk "conflicting adjudications" at odds with Congress's intent. *Astra*, 563 U.S. at 120-22. And that, the Supreme Court explained, is why Congress enacted a detailed remedies provision to supply the "proper remed[ies]" for disputes between manufacturers and covered entities. *Id.*

*Astra*'s reasoning applies with full force to H.B. 2385, and it compels the conclusion that H.B. 2385 is preempted. *Drummond*, 2025 WL 3048929, at *7 (holding that similar state law "is materially the same as the unconstitutional third-party enforcement scheme that the Supreme Court dispatched with in *Astra*"). H.B. 2385 is preempted both because it regulates in this exclusively federal field and because it creates an enforcement mechanism that competes with the federal regime. *Id.* at *5-8. Under federal law, HHS uses various tools to secure compliance (informal dispute resolution, audits, corrective action, adjustments, etc.). By contrast, Oregon's process seeks to punish manufacturers for exercising their authority under federal law to impose reasonable conditions—and to haul them into state court where they face civil penalties. It is impossible to reconcile Oregon's state court enforcement process with *Astra*. 563 U.S. at 120-22.

Oregon cannot sidestep *Astra* and preemption by suggesting its statute regulates only "delivery" to contract pharmacies, not sales or prices. Oregon attempts to dictate to whom manufacturers must *sell* 340B-priced drugs, not just to whom those drugs must be "delivered" or "distributed." But for Oregon's law, many manufacturers would not agree to sell drugs at 340B prices to a covered entity (or a contract pharmacy acting on its behalf) for dispensing to the covered entity's patients at a contract pharmacy if the covered entity refuses to comply with manufacturers' contract pharmacy policy. Ex. 1, ¶ 19; Ex. 2, ¶¶ 16, 22-29; Ex. 3, ¶¶ 17-20; *Drummond*, 2025

WL 3048929, at *5-6 (recognizing similar state law's "practical effect" is to "require[] manufacturers to deliver drugs to contract pharmacies at a discounted price when they would otherwise be delivered at full price"). Of course, that does not mean that either covered entities or contract pharmacies cannot get those drugs. Ex. 2, ¶ 29; Ex. 3, ¶¶ 14, 17. They just have to purchase them at commercial prices. Ex. 2, ¶ 29; Ex. 3, ¶¶ 14, 17.

Thus, H.B. 2385's entire purpose is to force manufacturers to provide those same drugs to those same covered entities and pharmacies *at a lower price*. *Drummond*, 2025 WL 3048929, at *5-6; *Morrisey*, 760 F. Supp. 3d at 455-56. Indeed, if H.B. 2385 did not compel those sales at 340B prices, then there would be no 340B-priced drugs to deliver, and the law would be meaningless. H.B. 2385 § 1(1)(a), (c).

Even if H.B. 2385 were viewed as solely about "delivery," that does not help Oregon: *Novartis* explained in detail how 340B *does* address delivery to contract pharmacies, both through Section (a)(1) of the federal statute, the federal offer provision, and through the Section (a)(5) ban on diversion. 102 F.4th at 460-64. And *Novartis* and *Sanofi* both hold Congress *did* exercise authority over whether and when manufacturers can be required to deliver drugs to a covered entity's contract pharmacies, and that Congress intentionally preserved a manufacturer's discretion to impose reasonable conditions on their 340B offers. Moreover, covered entities have brought disputes over manufacturer contract pharmacy policies to be adjudicated under 340B's ADR procedures. Petition, *Open Door Cmty. Health Ctrs. v. AstraZeneca Pharms., LP*, (HHS Bd. Jan. 13, 2021), Ex. 34; Petition, *Univ. of Wash. Med. Ctr. v. AstraZeneca Pharms. LP* (HHS Bd. Sept. 29, 2023), Ex. 35. Thus, there is no genuine way to separate the subject matter of H.B. 2385 and 340B. H.B. 2385 is attempting to add new and explicit restrictions related to 340B's core obligations and operates in the heart of the field 340B occupies.

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** – Page 26

2. <u>H.B. 2385 Conflicts With The Federal Regime</u>

H.B. 2385 is also preempted under conflict preemption principles. Because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby*, 530 U.S. at 373, and "interferes with the methods by which the federal statute was designed to" achieve those purposes and objectives, it is conflict preempted, *Int'l Paper*, 479 U.S. at 494. *See Drummond*, 2025 WL 3048929, at *5-8 (holding that similar state law was likely conflict preempted); *Morrisey*, 760 F. Supp. 3d at 450-60.

a. *H.B. 2385 Impermissibly Expands Federal 340B Obligations*

H.B. 2385 conflicts with 340B's offer-and-acceptance mechanism and expands the federal subsidy by compelling additional 340B-priced transactions. It thus directly contravenes Congress's chosen methods, *Int'l Paper*, 479 U.S. at 494, and reworks manufacturers' 340B obligations.

*Novartis* establishes that the bargain offered by Congress—and accepted by manufacturers participating in 340B—allows manufacturers discretion to set certain reasonable terms of their 340B "offers" (*e.g.*, delivery terms and other reasonable conditions of purchase) other than the price, and that manufacturers discharge their 340B obligations so long as their "offers" to sell at the 340B price remain bona fide in light of other terms. 102 F.4th at 460-62. Thus, under federal law, manufacturers are free to include reasonable conditions in their 340B offers. *Id.* 459-64. PhRMA's members individually do so. Ex. 1, ¶¶ 14; Ex. 2, ¶¶ 13-14; Ex. 3, ¶¶ 12-13. By outlawing these conditions and forcing sales at the 340B price that would not otherwise occur under federal law, Oregon vastly expands the number of 340B transactions and unlawfully destroys the offer-acceptance construct Congress mandated. *See Astra*, 563 U.S. at 120. Without H.B. 2385, there would be no sale at the 340B price in circumstances that do not satisfy a contract

pharmacy or claims data condition in a manufacturer's offer.  With H.B. 2385, however, a purchase at the 340B price would occur:  H.B. 2385 bars manufacturers from imposing those federally lawful conditions, and, as a result, covered entities can accept the offer without them.

Requiring manufacturers to provide 340B-priced drugs in circumstances where federal law does not poses multiple direct conflicts with federal law.  To start, it "interfere[s] with the methods by which the federal statute was designed to" achieve its purposes.  *Int'l Paper*, 479 U.S. at 494. Congress chose to implement 340B through an offer-and-acceptance mechanism that allows manufacturers to make offers that are subject to conditions limiting contract pharmacy use and requiring claims data.  H.B. 2385 unlawfully compels manufacturers to provide 340B-priced drugs to contract pharmacies by dictating the contours of their offers, overruling what Congress permits in a 340B offer.  *Crosby*, 530 U.S. at 373 (a state may not adopt another "mechanism" to implement or enforce federal law); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103-05 (1992) (state laws promoting worker safety were preempted by federal safety statute because they interfered with Congress's chosen method); *Wis. Dep't of Indus., Labor & Human Rels. v. Gould, Inc.*, 475 U.S. 282, 286-87 (1986) (state law preempted where it conflicted with Congress's chosen technique); *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (state statute conflict preempted where it prohibited banks from selling insurance that Congress permitted).

And by compelling transactions at the 340B price that would not otherwise occur under federal law, H.B. 2385 expands the scope of manufacturers' 340B obligations.  That makes participation in 340B (and by extension, Medicare and Medicaid) significantly more burdensome, fundamentally altering the "delicate balance" struck by Congress to incentivize manufacturer participation.  *Drummond*, 2025 WL 3048929, at *6.  That, too, renders H.B. 2385 preempted.  *Id.*; *Int'l Paper*, 479 U.S. at 494 (state law preempted where it "upset[] the balance of public and private

interests so carefully addressed by the [federal statute]"); *Forest Park II*, 336 F.3d at 730, 732-33 (holding state law obligations are preempted when they conflict with a federal program that defines the terms of private participation in the federal program).

Because H.B. 2385 compels manufacturers to provide 340B-priced drugs in circumstances where federal law does not, it is preempted.

> *b.   H.B. 2385 Unlawfully Limits Access To Claims Data*

H.B. 2385 also restricts the collection of claims data.  H.B. 2385 § 1(2)(b).  But manufacturers are permitted under federal law to impose these conditions on their offers, and Oregon's prohibition skews the balance Congress struck.  *Supra* at 27-28.  The prohibition also "stands in direct conflict with the 340B Program's dispute resolution mechanism" and enforcement scheme.  *Drummond*, 2025 WL 3048929, at *7; *Morrisey*, 760 F. Supp. 3d at 450-53; *Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220, 2025 WL 1423630, at *13 (D.D.C. May 15, 2025).  And it impermissibly limits manufacturers' ability to use rebates that federal law explicitly contemplates. 90 Fed. Reg. at 36,163-65.

Under the federal regime, a manufacturer must first audit a covered entity before initiating ADR.  *See* 42 U.S.C. §§ 256b(a)(5)(C), (d)(3)(B)(iv).  Audits, in turn, are conducted "in accordance with procedures established by the Secretary relating to the number, duration, and scope."  *Id.* § 256b(a)(5)(C).  HHS has specified that manufacturers are only permitted to conduct an audit where they can "demonstrate … that there is 'reasonable cause,' supported by 'sufficient facts and evidence.'"  *Eli Lilly*, 2025 WL 1423630, at *2 (quoting 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996)).  Claims data provides the very "documentation" that is essential to initiate a federal audit.  *Drummond*, 2025 WL 3048929, at *7.  Manufacturers' policies to collect such data are in line with widespread "business practices" and collect "standard information."  *Novartis*, 102

F.4th at 463; *Morrisey*, 760 F. Supp. 3d at 451; Ex. 33 (claims data fields).

Yet H.B. 2385 directly interferes with that process by letting covered entities shield this information, limiting manufacturers' access to evidence of federal violations and handicapping their use of the exclusive federal dispute resolution process. *Eli Lilly*, 2025 WL 1423630, at *13. This creates a direct conflict with the federal regime. *Drummond*, 2025 WL 3048929, at *7; *Morrisey*, 760 F. Supp. 3d at 450-53. "By restricting the very method by which data collection is made, [the state statute] frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access" ADR and thus "stands as an obstacle to achieving the federal objective of preventing fraud in" 340B. *Morrisey*, 760 F. Supp. 3d at 453.

The inability to access claims data is not just a problem for 340B. Under the new IRA Medicare Drug Price Negotiation Program, HHS is to "negotiate" with manufacturers "maximum fair price[s]" for certain drugs. 42 U.S.C. § 1320f-3(a). Manufacturers must provide access to selected drugs at the so-called maximum fair prices, except when selected drugs are 340B-eligible and the 340B price is lower. *Id.* § 1320f-2(d). To avoid duplicating price reductions, this scheme requires identifying when a specific drug is acquired at the 340B price, a burden CMS places on manufacturers. *See* Ex. 30 at 57-58, 60. Manufacturers thus require claims data to avoid providing duplicative price reductions, including by implementing what is known as a "rebate model" as part of HHS's Rebate Model Pilot Program. But H.B. 2385 prohibits manufacturers from obtaining this very data.

### c. H.B. 2385 Impermissibly Seeks To Outlaw The Rebate Model

H.B. 2385 also conflicts with 340B by outlawing the use of the rebate model to provide the 340B price, despite rebates being explicitly permitted under federal law. *See* 42 U.S.C. § 256b(a)(1) ("taking into account any *rebate* or discount" (emphasis added)); 63 Fed. Reg.

35,239, 35,240 (June 29, 1998) (rebate option is "consistent with the section 340B rebate program"); *Eli Lilly*, 2025 WL 1423630, at *9 n.11 (stating 340B statute "explicitly contemplates a rebate mechanism" and holding rebate models are allowed by the federal statute); 90 Fed. Reg. at 36,163-65.

To facilitate compliance with the IRA and 340B, certain manufacturers have sought to use what is called the "rebate model," under which they would collect claims data and then provide the 340B price through rebates—rather than as upfront discounts—to assist in preventing duplicate discounts. *See* 90 Fed. Reg. at 36,163-65.  In August, HHS announced the establishment of the Rebate Model Pilot Program for certain manufacturers (including some of PhRMA's members) to offer the 340B price via rebates. *Id.*  PhRMA's participating members can utilize rebates and require certain claims data, like date of service, date of prescribing, prescriber identification, and other information. *Id.* at 36,164; Ex. 1, ¶ 16.  As HHS explained, the collection of this data is aimed at preventing duplicate discounts between 340B and the IRA.  90 Fed. Reg. at 36,163-64. Notwithstanding that, H.B. 2385 appears to outlaw manufacturers' ability to utilize the very rebate model contemplated by 340B and HHS.  That sets up yet another clear and direct conflict.

### d.  H.B. 2385 Conflicts With The Federal Enforcement Regime

H.B. 2385 also conflicts with the exclusive federal administrative and enforcement regime. *Drummond*, 2025 WL 3048929, at *7-8; *Morrisey*, 760 F. Supp. 3d at 457 ("If private attempts to enforce the 340B Program go against 'what Congress contemplated when it centralized enforcement in the [federal] government,' then so too would public attempts to enforce it."); 42 U.S.C. §§ 256b(d)(1)(B)(i)(IV), (ii) (anticipating iterative process between manufacturers and HHS).

Like the claims in *Astra*, H.B. 2385 conflicts with the federal enforcement regime by

usurping HHS's exclusive enforcement authority. *Drummond*, 2025 WL 3048929, at *7 (holding that, by enacting a similar state law, "Oklahoma stands functionally in the same place that the [plaintiff] did in *Astra*, enforcing the 340B Program itself"); *Morrisey*, 760 F. Supp. 3d at 457. Federal regulations make clear HHS's view that it has authority to address the issues H.B. 2385 targets. *See* 42 C.F.R. § 10.21(a)(1); 89 Fed. Reg. at 28,649 (defining overcharge claim in ADR to be "a claim that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price or the manufacturer does not offer the 340B ceiling price"). Yet Oregon seeks to address the same disputes, contra to *Astra*. *Drummond*, 2025 WL 3048929, at *8 (similar state law is the state's "attempt … to police potential overcharges"); *Morrisey*, 760 F. Supp. 3d at 453-59.

A preview of potential state enforcement proceedings underscores the conflict. In any state proceeding, a manufacturer is likely to assert federal defenses. These will require deciding multiple federal law questions, including whether: (1) the prescriptions are written for qualifying 340B patients, under the federal definition of "340B patient," *Eli Lilly*, 2025 WL 1423630, at *2; (2) the prescriptions illegally duplicate Medicaid rebates, 42 U.S.C. § 256b(a)(5)(A); (3) the contract pharmacy that dispenses the 340B-priced drugs could lawfully receive it, *id.* § 256b(a)(5)(B); and/or (4) any violations under federal law disqualify the covered entity from participation in 340B, *Astra*, 563 U.S. at 120.

Permitting state intervention in these issues would allow 50 states to subvert and destroy the federal government's unified control over 340B. *Arizona*, 567 U.S. at 406; *Gould*, 475 U.S. at 286. That is precisely what multiple courts have now held, concluding that "[b]ecause the analysis is not a mere mechanical application of federal law, the potential for conflicting determinations raises the specter that Congress's intended *uniform* scheme would be derailed." *Drummond*, 2025

WL 3048929, at *8; *Morrisey*, 760 F. Supp. 3d at 458.  With many states enforcing their own visions of 340B, the uniformity central to 340B's administration would be shattered.  *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 639 (1973).

## II.   H.B. 2385 VIOLATES THE CONSTITUTION'S BAR ON EXTRATERRITORIAL REGULATION

H.B. 2385's direct regulation of out-of-state transactions violates the U.S. Constitution's prohibition on extraterritorial regulation.

Since ratification of our Nation's Constitution, the states have been governed by a fundamental principle:  no state can regulate conduct outside its boundaries in the territory of its sister states.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).  This principle flows both from the Constitution's Commerce Clause, which gives our federal government responsibility for regulating commerce among the states, and from several other Constitutional provisions defining the role of states within our Republic.  U.S. Const. art. I, § 8, cl. 3; *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374, 376 n.1 (2023); *Accessible Meds.*, 140 F.4th 957, 959.  Recognizing the issues inherent in regulating conduct across state lines, the Framers designated Congress as the sole authority for governing commerce between states.  The U.S. Constitution provides that "Congress shall have [the] Power … [t]o regulate Commerce … among the several States."  U.S. Const. art. I, § 8, cl. 3.  This affirmative grant of power includes a "negative command, known as the dormant Commerce Clause," which prohibits states from legislating in ways that hinder interstate commerce and disrupt unified national markets.  *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

H.B. 2385 violates these principles.  As *Pork Producers* and *Accessible Medicines* reinforce, a state cannot "*directly* regulat[e] transactions which take place wholly outside the State."  *Accessible Meds.*, 140 F.4th at 961 (quoting *Pork Producers*, 598 U.S. at 376 n.1).  Nor

does a state have the "power to project its legislation into another state by regulating the price to be paid in that state." *Id.* at 960 (quoting *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003); *id.* at 961 (*Pork Producers* "'sa[id] nothing new' about the extraterritoriality doctrine" (quoting *Pork Producers*, 598 U.S. at 374)).

*Accessible Medicines* is particularly instructive here:  The court held that a state cannot regulate transactions between drug manufacturers and distributors occurring out of state, even if the drugs at issue are eventually sold in the regulating state.  That case involved a Minnesota law prohibiting manufacturers from "impos[ing], or caus[ing] to be imposed, an excessive price increase … on the sale of any generic or off-patent drug sold, dispensed, or delivered to any consumer in the state." *Id.* at 959 (quoting Minn. Stat. § 62J.842 subd. 1).  Minnesota sought to defend its statute by arguing that it applied only to drugs ultimately sold to consumers in Minnesota.  *Id.* at 960.  But that was not enough to avoid the constitutional problem.  What mattered was where the conduct that the statute prohibited occurred.  Because the statute prohibited a manufacturer's sale at an "excessive" price, the relevant location was the location of the manufacturer's sale.  *Id.* at 959-60.  Because an out-of-state "manufacturer would be penalized if it sold drugs to a New Jersey distributor at prices above those proscribed by the Act," the law violated the dormant Commerce Clause for two separate reasons: it "*directly* regulate[d] transactions which t[ook] place wholly outside the State" and it had "the specific impermissible extraterritorial effect of controlling prices outside of Minnesota." *Id.* at 959, 961.  That the drugs later "ended up in Minnesota" was irrelevant.  *See id.* at 959-60.

H.B. 2385 violates the Constitution's prohibition on extraterritorial regulation for the same reason as in *Accessible Medicines*.  As there, PhRMA's members and the main distributors to which they sell are all located outside of Oregon.  Pharmacies and healthcare providers then

purchase PhRMA's members' drugs from these out-of-state distributors. Although the financial flows are complex, the bottom line is that distributors do not pay manufacturers more for drugs than the amount for which they sell them. So when H.B. 2385 mandates that a particular drug be sold by a manufacturer at the 340B price instead of a commercial price, a corresponding price reduction for the drug must also occur between the out-of-state manufacturer and out-of-state distributor. Ex. 2 ¶¶ 10, 20-23; Ex. 3 ¶¶ 16-17. Those transactions occur entirely outside Oregon.

So, the fundamental problem is that H.B. 2385 "*directly* regulate[s] transactions which take place wholly outside [Oregon]." *Accessible Meds.*, 140 F.4th at 961. And by requiring manufacturers to change their pricing practices, H.B. 2385 also has "the specific impermissible extraterritorial effect of controlling prices outside of [Oregon]." *Id.* at 960. Oregon cannot dictate to manufacturers how they conduct business outside Oregon.

If anything, the case for H.B. 2385 violating the Constitution is stronger than in *Accessible Medicines*. The law there at least required a drug at some point to be "sold, dispensed, or delivered … in the State." *Id.* at 959 (quoting Minn. Stat. § 62J.842 subd. 1). H.B. 2385 contains no geographic limitations. *See* H.B. 2385 § 1(1)(a) (incorporating federal definition of "covered entity" which applies nationwide). Even if H.B. 2385 were limited to drugs ultimately purchased by Oregon covered entities, extraterritoriality problems would remain given that Oregon covered entities contract with out-of-state pharmacies. *See* U.S. Health Resources and Services Administration, 340B OPAIS Database, https://340bopais.hrsa.gov/SearchCp. Even if these pharmacies provide drugs to Oregon patients of Oregon covered entities, Oregon cannot regulate these far-flung transactions. *Styczinski v. Arnold*, 46 F.4th 907, 912-14 (8th Cir. 2022) (holding Minnesota lacked power to regulate transaction with Minnesota resident in Nevada). The law thus directly regulates extraterritorial conduct under *Accessible Medicines,* multiple times over.

## CONCLUSION

PhRMA respectfully requests that the Court enter summary judgment in its favor.


Dated:  November 20, 2025                Respectfully submitted,

_s/ Eryn Karpinski Hoerster_

FOSTER GARVEY PC
Eryn Karpinski Hoerster, OSB #106126
E-mail: eryn.hoerster@foster.com
121 SW Morrison Street, Eleventh Floor
Portland, Oregon 97204-3141
Telephone: (503) 228-3939
Facsimile: (503) 226-0259

_s/ Philip J. Perry_

LATHAM & WATKINS LLP
Philip J. Perry*
Andrew D. Prins*
Abid. R. Qureshi*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1359
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com


*Admitted pro hac vice*

*Attorneys for Plaintiff Pharmaceutical
Research and Manufacturers of America*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,993 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.


<u>*s/ Philip J. Perry*</u>
Philip J. Perry

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2025, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will serve counsel for Defendants.

_s/ Philip J. Perry_
Philip J. Perry