Christopher J. Kayser (OSB #984244)
ckayser@lvklaw.com
David G. Samuels (OSB #206308)
dsamuels@lvklaw.com
LARKINS VACURA KAYSER LLP
121 SW Morrison Street, Suite 700
Portland, Oregon 97204
Telephone: 503-222-4424

Ronald S. Connelly (DC Bar No. 488298)
(Admitted pro hac vice)
POWERS PYLES SUTTER & VERVILLE, PC
1250 Connecticut Ave. N.W., 8th Floor
Washington, DC 20036
T: (202) 466-6550

*Attorneys for Intervenor*
*Oregon Primary Care Association*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAN RAYFIELD, in his official capacity as Attorney General of the State of Oregon, *et al.*,<br><br>Defendants,<br><br>and<br><br>OREGON PRIMARY CARE ASSOCIATION,<br><br>Intervenor. | Case No. 3:25-cv-01754-IM<br><br>INTERVENOR OREGON PRIMARY CARE ASSOCIATION’S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. PhRMA's Intergovernmental Immunity Arguments Have No Merit ........ 2

A. The Supremacy Clause Does Not Displace H.B. 2385 ........ 3

1. H.B. 2385 Is Not Discriminatory on Its Face ........ 3

2. H.B. 2385 Does Not Regulate the Government ........ 11

a. H.B. 2385 Does Not Dictate the Terms of Drug Manufacturer PPAs ........ 11

b. H.B. 2385 Does Not Create Obligations for the Federal Government ........ 14

B. The 340B Statute Does Not Give the Federal Government Exclusive Prerogative Over 340B Drug Distribution ........ 17

II. PhRMA's Field and Conflict Preemption Arguments Rest on a Mischaracterization of the 340B Program and Have Been Rejected by Multiple Courts ........ 19

A. Congress Did Not Intend for Covered Entities to Underutilize the 340B Program ........ 19

B. PhRMA's Manufacturer Protection Arguments Are Contrary to the Text and History of the 340B Statute and Basic Common Sense ........ 22

1. Congress Protects Manufacturers by Limiting the Program to Covered Entity Patients, Not by Limiting Use of Contract Pharmacies ........ 22

2. Manufacturers Agreed to the Terms of the 340B Program When There Were No Limits on Contract Pharmacies ........ 24

3. The Use of Contract Pharmacies Is Consistent With the Program's Purpose to Serve More Patients and Provide More Comprehensive Services ........ 25

4. The Notion That Congress Intended to Protect Manufacturers from Covered Entities Furnishing 340B Drugs to More Eligible Patients Defies Common Sense ........ 26

C. Once It Is Understood That Covered Entities' Use of Contract Pharmacies Furthers Rather Than Frustrates the 340B Program's Purpose, PhRMA's Field and Conflict Preemption Arguments Fall Apart .............................. 27

1. H.B. 2385 is Not Field Preempted .............................................. 27

2. H.B. 2385 is Not Conflict Preempted .......................................... 29

III. H.B. 2385 is Not an Extraterritorial Regulation .................................................. 31

CONCLUSION ........................................................................................................ 35

CERTIFICATE OF COMPLIANCE ......................................................................... 37

CERTIFICATE OF SERVICE .................................................................................. 37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie, Inc. v. Brown*,
No. 24-1939, 2026 WL 1005576 (4th Cir. Apr. 14, 2026) .......... 6

*AbbVie, Inc. v. Fitch*,
152 F.4th 635 (5th Cir. 2025) .......... 2, 7, 22

*AbbVie, Inc. v. Fitch*,
152 F.4th at 645–48 .......... 18

*AbbVie, Inc. v. Murrill*,
166 F.4th 528 (5th Cir. 2026) .......... 2, 18

*AbbVie, Inc. v. Weiser*,
No. 1:25-cv-01847 (D. Colo. Oct. 31, 2025), ECF No. 115 .......... 7, 16, 18, 28

*Am. Hosp. Ass'n v. Becerra*,
596 U.S. 724 (2022) .......... 19

*Association des Éleveurs de Canards et d'Oies du Québec v. Harris*,
729 F.3d 937, 950–52 (9th Cir. 2013) .......... 34

*Astra USA, Inc. v. Santa Clara Cnty*,
563 U.S. 110 (2011) .......... 6

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) .......... 24

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) .......... 11, 12

*Forest Park II v. Hadley*,
336 F.3d 724 (8th Cir. 2003) .......... 15, 16

*Genesis Health Care, Inc. v. Becerra*,
701 F. Supp. 3d 312 (D.S.C. 2023) .......... 20, 29

*GEO Grp., Inc. v. Inslee*,
151 F.4th 1107 .......... 8, 9, 12, 14

*GEO Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) (en banc) .......... 3, 10

*Healy v. Beer Institute, Inc.*,
491 U.S. 324 (1989) .......... 35

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .....5

*McHenry Cnty. v. Raoul*,
44 F.4th 581 (7th Cir. 2022) .....9

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .....2, 31, 35

*North Dakota v. United States*,
495 U.S. 423 (1990) .....3

Notice Issued to All Appellees, *PhRMA v. McCuskey*,
No. 25-1054 (4th Cir. Apr. 14, 2026), ECF 142 .....1

*Novartis Pharms. Corp. v. Frey*,
No. 1:25-cv-00407, 2025 WL 2813787 (D. Me. Sept. 23, 2025) .....4, 24, 28, 29

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) .....9, 13, 15, 23, 24

*Nwauzor v. GEO Grp., Inc.*,
127 F.4th 750 (9th Cir. 2025) .....3, 7, 8, 9, 10, 11, 12

*O'Melveny & Myers v. F.D.I.C.*,
512 U.S. 79 (1994) .....7, 28

*Paul v. Monts*,
906 F.2d 1468 (10th Cir. 1990) (per curiam) .....28

*PhRMA v. Fitch*,
No. 24-60340, 2026 WL 963501 (5th Cir. Apr. 9, 2026) .....5

*PhRMA v. Frey*,
No. 1:25-CV-00469-JCN, 2026 WL 184504 (D. Me. Jan. 23, 2026)
.....3, 4, 6, 7, 9, 10, 13, 14, 15, 16, 17

*PhRMA v. McClain*,
95 F.4th 1136 (8th Cir. 2024) .....2, 5, 7, 9, 12, 14, 15, 18, 23, 29

*PhRMA v. McClain*,
No. 4:21-cv-00864 (E.D. Ark. 2022), ECF Nos. 65 .....2

*PhRMA v. McCuskey*,
171 F.4th 675 (4th Cir. 2026) .....1, 4, 5, 6, 10, 17, 18

*PhRMA v. Murrill*,
No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) .....12, 13, 15

*PhRMA v. Walsh*,
538 U.S. 644 (2003) ........ 14, 17, 30, 31, 35

*Rocky Mountain Farmers Union v. Corey*,
730 F.3d 1070, 1102–04 (9th Cir. 2013) ........ 34

*Rosenblatt v. City of Santa Monica*,
940 F.3d 439, 446–49 (9th Cir. 2019) ........ 33

*Sam Francis Foundation v. Christie's, Inc.*,
784 F.3d 1320 (9th Cir. 2015) (en banc) ........ 32, 35

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) ........ 9, 15, 23, 24, 28

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ........ 4

*United States v. Washington*,
596 U.S. 832 (2022) ........ 3, 10, 11, 17

**Federal Statutes**

42 U.S.C. § 256b(a)(5)(A)–(B) ........ 23

42 U.S.C. § 256b(a)(5)(C) ........ 23

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 7101-03,
124 Stat. 119, 821-28 (2010) ........ 25

**State Statutes**

H.B. 2385 ........ 1, 2, 3, 8, 9, 11, 15, 27, 29, 35

H.B. 2385 § 1(1)(c) ........ 14

H.B. 2385 §1(2) ........ 4

**Regulations**

42 C.F.R. § 412.96 ........ 26

**Federal Registers**

Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28,643, 28,644 (April 19, 2004)...16

Manufacturer Audit Guidelines and Dispute Resolution Process,
61 Fed. Reg. 65,406 (Dec. 12, 1996) ........ 23, 30

Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,276 (Mar. 5, 2010) ............ 19, 25, 26

Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ............ 18, 20, 26

**Other Authorities**

*340B Health Annual Survey 2022: Vital 340B-Supported Patient Services Threatened as Manufacturer Restrictions Cut Into Savings*, 340B Health, https://www.340bhealth.org/files/340B_Health_Survey_Report_2022_FINAL.pdf (last visited May 12, 2026) ............ 21

Bausch Health Cos., Quarterly Report (Form 10-Q), at 53 (Oct. 30, 2025) ............ 10

Br. for Appellee AstraZeneca Pharms. LP at 27-28, *AstraZeneca Pharms. LP v. U.S. Dept. of Health & Hum. Servs*, No. 22-1676 (3d Cir. Jul. 21, 2022), ECF 31 (consolidated with *Sanofi Aventis U.S. LLC v. U.S. Dept. of Health & Hum. Servs*, 58 F.4th 696 (2023)) ............ 14, 24

Br. for Appellee Novartis Pharms. Corp. at 3, *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024), No. 21-5299, ECF 1949831 ............ 24

*Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals*, 340B Health, 1 (July 2023), https://www.340bhealth.org/files/Contract_Pharmacy_Financial_Impact_Report_July_2023.pdf ............ 20, 22

*Fact Sheet-340B Drug Pricing Program: Contract Pharmacy Arrangements*, Am. Hosp. Ass'n, 1 (Jan. 2025), https://www.aha.org/system/files/media/file/2020/10/fact-sheet-340b-drug-pricing-program-contract-pharmacy-arrangements.pdf ............ 21

H.R. Rep. No. 102-384 pt. 2 (1992) ............ 19

*Manufacturer Restrictions on Contract Pharmacies*, Nat'l Ass'n of Comty. Health Ctrs, https://opus-nc-public.digitellcdn.com/uploads/nachc/redactor/f7c28bc2b8d6e670f44ac5dc12ad8bb8a2819461701eb61b96ba33cedf82e838.pdf (last visited May 12, 2026) ............ 21

Sample PPA, HRSA (Jan. 31, 2026), https://www.hrsa.gov/sites/default/files/hrsa/opa/manufacturer-ppa.pdf ............ 11, 12, 13, 14, 20

*Statement on D.C. Circuit Appeals Court Decision on Drug Companies' 340B Restrictions*, 340B Health (May 22, 2024), https://www.340bhealth.org/newsroom/statement-on-d.c-circuit-appeals-court-decision-on-drug-companies-340b-restrictions/ ............ 21

# INTRODUCTION

PhRMA and its members have been fighting state contract pharmacy laws for nearly six years and have met defeat repeatedly, as courts across the country have rejected their ever-shifting constitutional challenges. PhRMA leans into the one outlier court of appeals opinion favoring drug companies, but as the dissent in that case explained at length, the Fourth Circuit majority created a novel preemption theory with no basis in the Constitution. *PhRMA v. McCuskey*, 171 F.4th 675, 691–715 (4th Cir. 2026) (Benjamin, J., dissenting). Indeed, the Fourth Circuit requested briefing on West Virginia's petition for rehearing en banc, so that case is not final. *See* Notice Issued to All Appellees, *PhRMA v. McCuskey*, No. 25-1054 (4th Cir. Apr. 14, 2026), ECF No. 142.

The Eighth and Fifth Circuits both held that state contract pharmacy laws are not preempted by the 340B statute, so PhRMA now adds a new twist, arguing that H.B. 2385 is preempted under the intergovernmental immunity doctrine. This Court should reject the novel theory that H.B. 2385 violates the intergovernmental immunity doctrine because H.B. 2385 does not directly regulate or discriminate against the federal government or its contractors. Drug companies that participate in the federal 340B Program are not government contractors because they do not perform governmental functions or supply goods or services to the federal government under the program. Even if they were government contractors, H.B. 2385 does not discriminate against drug companies that participate in the 340B Program because H.B. 2385 regulates other entities besides drug companies. Neither does H.B. 2385 directly regulate the federal government because it does not modify the terms of drug manufacturers' Pharmaceutical Pricing Agreements ("PPAs") or create obligations for the federal government.

H.B. 2385 is also not field or conflict preempted because it governs drug distribution, while the 340B statute governs drug pricing. The Fifth and Eighth Circuits rejected identical

preemption arguments and upheld laws substantially similar to H.B. 2385. *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024); *AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025); *AbbVie, Inc. v. Murrill*, 166 F.4th 528 (5th Cir. 2026). The 340B statute does not expressly preempt state drug distribution laws like H.B. 2385, nor does it impliedly preempt those laws because the 340B statute is not a comprehensive regulatory scheme and is silent on drug distribution. Congress acquiesced to state regulation of drug distribution by declining to address contract pharmacy arrangements when it first adopted and later amended the 340B statute.

PhRMA's last-ditch effort is to revive an extraterritoriality argument that it abandoned in a challenge to an Arkansas law similar to H.B. 2385. *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), clarified that the extraterritoriality doctrine is extremely narrow. In Arkansas, PhRMA ultimately withdrew its extraterritoriality claim "[i]n light of the Supreme Court's decision in *National Pork Producers Council v. Ross*." *PhRMA v. McClain*, No. 4:21-cv-00864 (E.D. Ark. 2022), ECF Nos. 65 ¶ 2, 67 ¶ 3, 79. The claim has no more merit here than it did in Arkansas. H.B. 2385 is not an unconstitutional extraterritorial law because it does not directly regulate transactions occurring wholly outside of Oregon. H.B. 2385 only regulates in-state market access (i.e., delivery of drugs bought by Oregon covered entities). H.B. 2385 neither establishes drug prices nor directly regulates transactions occurring wholly outside Oregon.

## ARGUMENT

### I. PhRMA's Intergovernmental Immunity Arguments Have No Merit

H.B. 2385 furthers Congress's vision for the 340B Program. In arguing that H.B. 2385 is preempted, PhRMA relies on a novel and meritless theory that the law violates the intergovernmental immunity doctrine because it discriminates against drug manufacturers and directly regulates the federal government.

### A. The Supremacy Clause Does Not Displace H.B. 2385

The intergovernmental immunity doctrine protects the federal government from state laws that either: 1) directly regulate it; or 2) discriminate against it. *United States v. Washington*, 596 U.S. 832, 835 (2022). H.B. 2385 does neither. The immunity doctrine extends to discrimination against "those with whom [the federal government] deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). The phrase "with whom the government deals" encompasses federal contractors, federal employees, and other federal instrumentalities. *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 760–61 (9th Cir. 2025). Drug companies that participate in the 340B Program are none of these. Even if they were, "federal contractors are not equivalent to the federal government," and the scope of protections under the doctrine are much narrower for federal contractors than they are for the federal government. *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 750, 755, 760 n.10 (9th Cir. 2022) (en banc) (citing *United States v. New Mexico*, 455 U.S. 720, 736–38 (1982)) ("Private contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the government itself.").

#### 1. H.B. 2385 Is Not Discriminatory on Its Face

PhRMA makes a superficial argument that, because H.B. 2385 references the 340B statute, it is preempted by the 340B statute. Pl.'s Resp. to Intervenor-Def.'s Cross-Mot. & Reply in Supp. of Pl.'s Mot. for Summ. J. 3, ECF No. 67 ("PhRMA.Br."). The U.S. District Court in Maine, however, rejected PhRMA's similar claim regarding a law analogous to H.B. 2385, holding that the "immunity doctrine does not apply as broadly as [PhRMA] contends." *PhRMA v. Frey*, No. 1:25-CV-00469-JCN, 2026 WL 184504, at *7 (D. Me. Jan. 23, 2026) ("The Court declines to extend the [intergovernmental immunity doctrine] to cover any state law that adds a requirement for participants in a federally regulated market or under a federal program."); *see*

*also Novartis Pharms. Corp. v. Frey*, No. 1:25-cv-00407, 2025 WL 2813787, at *10 (D. Me. Sept. 23, 2025) ("The Supreme Court, however, has never adopted a categorical rule that requires a finding of preemption whenever a state law is addressed directly to those participating in a federal program where the federal statute does not rely on the state to implement the program.").

PhRMA is wrong that H.B. 2385 "singles out" and "applies only" to manufacturers participating in the 340B Program. PhRMA.Br.3–4 (citing to H.B. 2385 §1(2)). As Intervenor Oregon Primary Care Association ("OPCA") explained in its opening brief, PhRMA's intergovernmental immunity doctrine argument fails because "H.B. 2385 does not single out *manufacturers* for regulation." OPCA MSJ 12; *see also United States v. California*, 921 F.3d 865, 881 (9th Cir. 2019) (intergovernmental immunity doctrine "is not implicated when a state merely references or even singles out federal activities."). H.B. 2385 applies to any "manufacturer *or third party* on behalf of a manufacturer," including drug wholesalers and repackagers. H.B. 2385 §1(2). Such third parties do not sign PPAs with the Department of Health and Human Services ("HHS"), meaning they are not entities "with whom the government deals" for purposes of the 340B Program.

PhRMA devotes almost half of its brief arguing that the intergovernmental immunity doctrine is broad, but other courts reviewing laws similar to H.B. 2385 rejected PhRMA's antiquated reading.[1] *McCuskey*, 171 F.4th at 689; *PhRMA v. Frey*, 2026 WL 184504, at *7. Indeed, in rejecting PhRMA's similar immunity doctrine claim, the *Frey* court explained that the "evolution of the doctrine weighs against a broad application" here. *Id.* at *7 n.7. While the

[1] PhRMA speculates about why OPCA addressed intergovernmental immunity last in its opening brief. PhRMA.Br.4-5. OPCA addressed intergovernmental immunity last because it is even weaker than PhRMA's other preemption claims.

doctrine derives from *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), the "Supreme Court later recognized that the [original] approach was untenable and 'repudiated' the broader rule in a series of cases beginning in the 1930s." *Id.* (quoting *South Carolina v. Baker*, 485 U.S. 505, 520–21 (1988) ("The thoroughness with which the Court abandoned the burden theory was demonstrated most emphatically when the Court upheld a state sales tax imposed on a Government contractor even though the financial burden of the tax was entirely passed on, through a cost-plus contract, to the Federal Government.")).

The Fourth Circuit's opinion is premised on the similar novel and erroneous theory that PhRMA presses here. *McCuskey*, 171 F.4th 675. That court determined that West Virginia's drug distribution law should be analyzed under a stricter preemption standard because the 340B statute was enacted under Congress's Spending Clause authority. As the dissent in *McCuskey* explains, the "majority not only diverges from the near-unanimous view among federal courts but also introduces unnecessary confusion into the preemption analysis." *Id.* at 701 (Benjamin, J., dissenting). Instead of following a standard preemption analysis (as the Eighth and Fifth Circuits did when upholding laws like H.B. 2385), the *McCuskey* majority invented a "more stringent [preemption analysis] for laws passed under Congress' spending power." *Id.* But "there is no binding or persuasive authority requiring a different preemption analysis for laws passed under the Spending Clause." *Id.* at 697. Therefore, PhRMA's "novel analytical framework" directly contradicts circuit courts applying the standard preemption analysis. *Id.* at 701; *see also McClain*, 95 F.4th 1136; *PhRMA v. Fitch*, No. 24-60340, 2026 WL 963501 (5th Cir. Apr. 9, 2026).

PhRMA's intergovernmental immunity argument rests on the incorrect premise that drug manufacturers participating in the 340B Program are contractors with the federal government.

PhRMA.Br.4–9.[2] But even the *McCuskey* court understood that drug manufacturers that participate in the 340B Program are not federal contractors. *McCuskey*, 171 F.4th at 687–89; *accord AbbVie, Inc. v. Brown*, No. 24-1939, 2026 WL 1005576, at *1 (4th Cir. Apr. 14, 2026). Although the Fourth Circuit's ultimate decision was incorrect, it correctly held that "the intergovernmental-immunity doctrine does not control" because "[a] manufacturer that participates in the 340B Program is not strictly a federal contractor or supplier, and it does not "supply drugs to the federal government under § 340B." *McCuskey*, 171 F.4th at 689; *see also PhRMA v. Frey*, 2026 WL 184504, at *6 (Manufacturers "do not agree to perform any function of the federal government or provide any goods or services to the federal government," and "do not fall within any of the recognized categories of entities with whom the government 'deals' for purposes of intergovernmental immunity, such as employees, contract workers, suppliers, or instrumentalities."). This is because PPAs "'are not transactional, bargained-for contracts.'" *Id.* (citing *Astra USA, Inc. v. Santa Clara Cnty*, 563 U.S. 110, 113 (2011)); *PhRMA v. Frey*, 2026 WL 184504, at *6 (PPAs "have no negotiable terms" and merely "serve as the means by which drug manufacturers opt into the statutory scheme." (quoting same)). PPAs "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them" and "contain no negotiable terms." *Astra*, 563 U.S. at 118.

There is no need to demonstrate congressional authorization for H.B. 2385, PhRMA.Br.5, because only a state law "within the scope of the doctrine" must have congressional authorization. *PhRMA v. Frey*, 2026 WL 184504, at * 5 (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988)). And a state law is only within that scope if it "regulates the

[2] PhRMA falsely suggests that OCPA admitted drug manufacturers are federal contractors. PhRMA.Br.10; *see* OPCA.MSJ.32 (hypothetically stating, "[m]anufacturers may be federal contractors" in arguing that, even if they were, they are not on equal footing as the government).

United States directly or discriminates against the Federal Government or those with whom it deals." *Id.* (quoting *North Dakota*, 495 U.S. at 435). As demonstrated below, H.B. 2385 does neither, so congressional authorization is irrelevant. Furthermore, the 340B statute does not preempt H.B. 2385 because the 340B statute says nothing about delivery and distribution of 340B drugs. As the Fifth and Eighth Circuits have held, "Congress chose not to regulate distribution [of 340B-priced drugs] to patients, indicating that it did not intend to occupy the entire field in this area." *AbbVie, Inc. v. Fitch*, 152 F.4th at 646; *see McClain*, 95 F.4th at 1144; *PhRMA v. Frey*, 2026 WL 184504, at *9; Order Denying Pls.' Mot. Prelim. Inj. at 13, *AbbVie, Inc. v. Weiser*, No. 1:25-cv-01847 (D. Colo. Oct. 31, 2025), ECF No. 115. As the Supreme Court has concluded, "matters left unaddressed in [] a [federal] scheme are presumably left subject to the disposition provided by state law." *O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 85 (1994).

*Nwauzor v. GEO Group*, 127 F.4th 750 (9th Cir. 2025), does not support PhRMA's position that H.B. 2385 is discriminatory because it only applies to manufacturers that participate in the 340B Program. PhRMA.Br.6. As previously explained, the law applies not only to participating manufacturers *but also* third parties, which do not sign PPAs with HHS. Furthermore, the *Nwauzor* analysis that PhRMA relies on to support its argument that "H.B. 2385 discriminates on its face," PhRMA.Br.6, is irrelevant because that analysis relates to the direct regulation prong of the immunity doctrine analysis. *Nwauzor*, 127 F.4th at 760–61.[3]

The *Nwauzor* court found that an analysis of whether a state law violates the intergovernmental immunity doctrine often turns on whether the group to which the regulated entity compared is "similarly situated." *Id.* at 764. The court addressed whether Washington's

[3] *Nwauzor*'s direct regulation analysis supports OPCA's argument too, as explained in more detail, *infra* Section I.A.2.a.

minimum wage law was discriminatory under the intergovernmental immunity doctrine because the law applied to a private detention facility that contracted with the federal government but not state-run detention facilities. *Id.* at 757–59. The majority found that the law was not discriminatory because it applied equally to all private detention facilities, whether or not they contracted with the federal government. *Id.* at 763–67. The dissent argued that the law was discriminatory based on a comparison between state detention facilities and federal contractors. *Id*. at 771–77. The majority described the dissent's comparison as "apples to oranges" and concluded that this incorrect comparison led to the dissent's "wrong answer." *Id*. at 764; *see also GEO Grp., Inc. v. Inslee*, 151 F.4th 1107, 1119–20 (the "key issue" under the intergovernmental immunity analysis was whether for-profit prison facilities subject to a state law should be compared with state-run facilities).

In this case, PhRMA similarly makes the wrong comparison leading to the "wrong answer." PhRMA argues that H.B. 2385 treats drug manufacturers that participate in the 340B Program differently than non-participating manufacturers. PhRMA.Br.8. But those two groups are not "similarly situated." Drug manufacturers that do not participate in the 340B Program are not obligated to deliver 340B drugs under H.B. 2385 because they do not have any 340B drugs to deliver.

Furthermore, a state law violates the intergovernmental immunity doctrine only if it "treats a state entity more favorably than it treats a comparable federal entity." *GEO Grp., Inc.*, 151 F.4th at 1118. In this case, there is no state entity, much less one that is being treated better. *Nwauzor*, 127 F.4th at 767. If a drug manufacturer were a federal contractor under the 340B Program (which it is not), the relevant comparison of similarly situated entities would be "whether [H.B. 2385] treats private [entities] operated under contract with the federal

government differently from private [entities] operated under contract with the state government." *Id.* at 763. Because PhRMA "cannot identify any actors 'similarly situated' to the federal government that receive more favorable treatment under the Act," it has failed to show the requisite discriminatory treatment to constitute a violation of the intergovernmental immunity doctrine. *McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022).

PhRMA's examples that supposedly "bring home the point" that H.B. 2385 is discriminatory ignore both the facts and the statutory language. PhRMA.Br.7. Its first hypothetical, postulating a state workers' compensation law that applies only to federal contractors, is inapplicable because H.B. 2385 does not apply exclusively to federal contractors and drug manufacturers are not federal contractors. *PhRMA v. Frey*, 2026 WL 184504, at *6.

PhRMA's second hypothetical, a state law that requires only trucks delivering 340B drugs to get 30 miles per gallon or less, is equally unpersuasive. The 340B statute is silent about drug delivery. *McClain*, 95 F.4th at 1143; *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023) ("*Sanofi*"); *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460–62 (D.C. Cir. 2024) ("*Novartis*"). It therefore does not dictate what 340B distribution laws a state may enact. To show unconstitutional discrimination, PhRMA must show that H.B. 2385 treats state entities better than comparable federal entities. *GEO Grp., Inc.*, 151 F.4th at 1118. PhRMA's conclusory assertion falls far short of meeting this threshold.

PhRMA cites the United States' amicus brief from another case to insinuate that Bausch Health ("Bausch") withdrew from the 340B Program due to state laws like H.B. 2385. PhRMA.Br.8. Bausch's own report, cited by the United States, contradicts the conclusion that state laws had anything to do with Bausch's exit. U.S. Amicus Br. 18. Bausch discusses the federal Inflation Reduction Act, which allows the Medicare program to negotiate prices for

selected drugs and that one of Bausch's products was selected for negotiation. Bausch Health Cos., Quarterly Report (Form 10-Q), at 53 (Oct. 30, 2025). Bausch does not state that its decision to withdraw from the 340B Program was due to state laws like H.B. 2385.

PhRMA argues that the "two relevant groups" to compare here are "manufacturers that do participate in 340B, and manufacturers that do not." PhRMA.Br.8. The *Frey* court fully rejected this argument. *PhRMA v. Frey*, 2026 WL 184504, at *6. As in *Frey*, PhRMA has failed to propose "a relevant or workable set of comparators" here. *Id.* The *Frey* court reasoned:

> To the extent Plaintiff maintains that the set of similarly situated entities is comprised of all drug manufacturers doing business in Maine and participating in the 340B program, there is no discernible discrimination because the state statute does not make any other distinctions among the participants.
>
> To the extent Plaintiff contends that the set of similarly situated entities consists of all drug manufacturers, Plaintiff evidently argues that the relevant distinction would be participation or nonparticipation in the 340B program. Plaintiff, however, has not argued or provided evidence that there are any such nonparticipating drug manufacturers doing business in Maine. Even if such evidence were presented, Plaintiff has not established that [Maine's] additional rules for 340B participants are sufficiently burdensome to support a finding that Maine seeks to improperly favor nonparticipating manufacturers over participating manufacturers.

*Id.* (citing *McHenry Cnty.*, 44 F.4th at 594 (concluding that a state law impacting a federal domain "is not enough to establish discrimination" if one "cannot identify any actors similarly situated . . . that receive more favorable treatment" under the state law)).

*United States v. Washington* is inapplicable despite PhRMA's attempts to argue otherwise. PhRMA.Br.9–10. Even if H.B. 2385 applied only to federal contractors, it is inapposite here because drug manufacturers are not federal contractors, *McCuskey*, 171 F.4th at 689, and, for purposes of intergovernmental immunity, "federal contractors are not equivalent to the federal government." *Nwauzor*, 127 F.4th at 760; *GEO Grp., Inc.*, 50 F.4th at 750, 755, 760 n.10. Furthermore, the law in *Washington* "facially discriminate[d] against the Federal

Government and its contractors." *Washington*, 596 U.S. at 844. As explained above, H.B. 2385 applies to entities other than 340B manufacturers. Finally, the law in *Washington* "impose[d] upon the Federal Government costs that state or private entities do not bear." *Id.* at 839. H.B. 2385 imposes no costs on the federal government, and it does not impose a cost on drug manufacturers. When manufacturers enroll in the 340B Program, they agree to offer 340B discounts on all outpatient drugs purchased by a covered entity for use by its patients. *See* Sample PPA, HRSA (Jan. 31, 2026), https://www.hrsa.gov/sites/default/files/hrsa/opa/manufacturer-ppa.pdf. They know full well that they are required to provide 340B drugs for 100% of a covered entity's patients. H.B. 2385 does not impose additional costs on drug manufacturers.

**2. H.B. 2385 Does Not Regulate the Government**

H.B. 2385 does not regulate the federal government directly, as PhRMA argues. PhRMA.Br.10–12. H.B. 2385 does not change the terms of PPAs or add additional obligations for the federal government. Tellingly, the United States has not argued that state laws like H.B. 2385 directly regulate the federal government in either of these ways. U.S. Amicus Br. (arguing only that H.B. 2385 is discriminatory under the immunity doctrine).

**a. H.B. 2385 Does Not Dictate the Terms of Drug Manufacturer PPAs**

A state law violates the intergovernmental immunity doctrine by directly regulating the federal government only if it "would control federal operations." *Nwauzor*, 127 F.4th at 760 (quoting *GEO Grp., Inc.*, 50 F.4th at 760). H.B. 2385 does not directly regulate the federal government or its operations. PhRMA.Br.10–12.

PhRMA relies on *Boeing Co. v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014), to argue that H.B. 2385 directly regulates the federal government, PhRMA.Br.11, but the state law in

*Movassaghi* effectively amended the terms of a contract between the federal government and Boeing. Several courts have ruled that state laws like H.B. 2385 do not modify the terms of the PPAs between drug manufacturers and HHS. *See, e.g.*, *PhRMA v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *12 (W.D. La. Sept. 30, 2024) (concluding that the "terms of the PPA remain unchanged" and that a state law similar to H.B. 2385 does not "increase[] or in any way change[] [manufacturer] obligations under its PPA"); *McClain*, 645 F. Supp. 3d at 901, *aff'd*, 95 F.4th 1136 (8th Cir. 2024) ("Plaintiff has provided no evidence that" a state law like H.B. 2385 "interferes with PPA[s] . . . or adds contract pharmacies to the covered entities list.").

A recent Ninth Circuit case, *GEO Group, Inc. v. Inslee*, is instructive. 151 F.4th 1107. *Inslee* considered a private company's challenge to a state law that required ICE holding centers run by a private entity to adhere to certain sanitary and safety standards. *Id.* at 1111–12. The court rejected the argument that *Movassaghi* was controlling because the state law in that case imposed obligations on a federal *contractor*, not the federal government. *Id.* at 1117. Again, drug manufacturers in the 340B Program are not "contractors," so they are not entitled to even the reduced protections available to federal contractors under the intergovernmental immunity doctrine. Second, the contract with the federal government in *GEO* explicitly required it to comply with state law. *Id.* at 1118; *see also Nwauzor*, 127 F.4th at 762 (quotations omitted). Similarly, the PPAs state that drug manufacturers agree to be subject to state laws. Sample PPA, HRSA ("Nothing in the Agreement will be construed to require or authorize the commission of any act contrary to law" and "Nothing in the Agreement shall be construed as a waiver or relinquishment of any legal rights of the Manufacturer or the Secretary under the Constitution, the Act, or Federal laws, or State laws."). Lastly, the state law in *GEO* did "not increase the federal government's costs" because "any increased costs [were] borne by [the federal

contractor], not by the government." *Id.* at 1117–18. Similarly, even if H.B. 2385 were to result in increased costs, those costs are not imposed on the federal government.

Although PhRMA acknowledges that drug manufacturers agree to be bound by state laws under the PPA, PhRMA argues that this agreement does not give states the right to "upset" the contractual relationship or to impact a manufacturer's rights under the PPA. PhRMA.Br.11–12. But PhRMA's argument is premised on its own unfounded allegations that H.B. 2385 changes the bargain under the PPA. Manufacturers understand that the PPA requires them to provide 340B drugs to <u>all</u> of a covered entity's patients. PhRMA is mistaken that *Sanofi*'s and *Novartis*'s acknowledgement of 340B's silence about drug distribution, *Novartis*, 102 F.4th at 460, somehow preserves drug manufacturer's "rights" to limit distribution at the expense of a sovereign state's authority to oversee the health and safety of its citizens through laws addressing drug distribution. PhRMA.Br.11–12. The same statutory silence that limits HHS's authority to take enforcement actions against contract pharmacy restrictions permits Oregon to regulate drug distribution. *PhRMA v. Frey*, 2026 WL 184504, at *13.

Finally, PhRMA argues that it makes no difference that its members are "not federal instrumentalities," alleging that H.B. 2385 directly regulates the federal government. PhRMA.Br.12. H.B. 2385 does not directly regulate the federal government or the terms of the PPA. First, the law does not regulate the federal government because the Oregon "statute does not place any tax, prohibition, or mandate on the federal government or its functions." *PhRMA v. Frey*, 2026 WL 184504, at *6. And, as explained in detail above, H.B. 2385 does not modify drug manufacturers' obligations under their PPAs. *PhRMA v. Murrill*, 2024 WL 4361597, at *12; *McClain*, 645 F. Supp. 3d at 901, *aff'd*, 95 F.4th 1136; *see also PhRMA v. Frey*, 2026 WL 184504, at *6. Even if H.B. 2385 did impose obligations, it "imposes no obligation on the

federal government." *GEO*, 151 F.4th at 1117. If states can impose obligations on federal contractors, as in *GEO*, they may certainly impose obligations on private entities that are not federal contractors.

**b. H.B. 2385 Does Not Create Obligations for the Federal Government**

PhRMA argues that H.B. 2385 "saddles" the federal government with more obligations, policing, and additional work. PhRMA.Br.12–14, 14 n.3. Not even the United States has alleged that state laws like H.B. 2385 will increase its workload. U.S. Amicus Br. PhRMA's allegation is pure, unsupported speculation. *PhRMA v. Walsh*, 538 U.S. 644, 667–68 (2003) (rejecting that a state law imposed a burden when severity of any impediment was a matter of conjecture).

H.B. 2385 will not increase the number of 340B transactions, and PhRMA's contention that OPCA conceded that it will is patently false. PhRMA.Br.13; OPCA.MSJ.Br.18 (stating that PHMRA's claim that H.B. 2385 compels additional transactions is "absolutely untrue"). Under their PPAs, drug manufacturers are required to provide 340B drugs to *all* a covered entity's patients. *See* Sample PPA, HRSA. Indeed, a PhRMA member represented to the Third Circuit that it would offer as many 340B discounted drugs as a covered entity orders. *See, e.g.*, Br. for Appellee AstraZeneca Pharms. LP at 27–28, *AstraZeneca Pharms. LP v. U.S. Dept. of Health & Hum. Servs*, No. 22-1676 (3d Cir. Jul. 21, 2022), ECF 31 (consolidated with *Sanofi Aventis U.S. LLC v. U.S. Dept. of Health & Hum. Servs*, 58 F.4th 696 (2023)) ("AstraZeneca's contract pharmacy policy complies with this ["must offer"] requirement: AstraZeneca makes its products available for purchase by covered entities at discounted prices—in any amount, without limitation."). Moreover, H.B. 2385 only applies to a drug "purchased by a covered entity." § 1(1)(c). The 340B transaction has already occurred before H.B. 2385 comes into play. It therefore cannot affect, let alone compel, transactions that occur before the law is even triggered.

In rejecting PhRMA's argument that state laws like H.B. 2385 expand the 340B Program and increase the number of transactions, the *Frey* court concluded that nothing in the 340B statute suggests "that Congress intended to limit the number of patients for whom covered entities may prescribe drugs at the discounted rate" or "that Congress intended to limit the number of legitimate discounted claims to a subset of a covered entity's eligible patients that corresponds to patients living in the immediate vicinity or a certain radius from the facility." *PhRMA v. Frey*, 2026 WL 184504, at *13. Quite the opposite: "Instead of limiting eligibility and participation, in 2010, Congress significantly increased the number of healthcare facilities that are considered covered entities, an expansion that included rural facilities serving patients over a greater geographic area." *Id.*

Despite PhRMA's attempt to rehabilitate its argument that *Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003), supports its arguments, PhRMA reads that case too broadly. The *Forest Park II* court did not adopt a broad rule preventing any "interfere[nce] with the implementation of a federal program by a federal agency." PhRMA.Br.13 (quoting *Forest Park II*, 336 F.3d at 732). In *Forest Park II*, the state law imposed requirements conflicting with federal rules by restricting participant rights and operating on different timelines. *Forest Park II*, 336 F.3d at 734. Here, there is no conflict because the 340B statute is silent on delivery and H.B. 2385 furthers the purpose of the 340B Program. *McClain*, 95 F.4th at 1143–45; *Sanofi*, 58 F.4th at 703; *Novartis*, 102 F.4th at 460–62; *PhRMA v. Murrill*, 2024 WL 4361597, at *13. Additionally, unlike this action, the state law in *Forest Park II* "regulated the relationship between the federal agency and the regulated entity rather than relationships between private parties." *PhRMA v. Frey*, 2026 WL 184504, at *15; *see also* Order Denying Pls.' Mot. Prelim. Inj., *Weiser*, No. 1:25-cv-01847 at 14 (concluding that there is no unique federal 340B interest because the state law

does not govern "the relationship between a federal agency and the entity it regulates"). By contrast, H.B. 2385 addresses the relationship between two private entities: manufacturers and covered entities. Even the *Forest Park II* court acknowledges that laws that impact federal programs are not categorically unconstitutional. *Forest Park II*, 336 F.3d at 734 ("We do not suggest that all state attempts at preserving existing federally subsidized, low-income housing are preempted. Nothing . . . indicates that states are prohibited from instituting their own incentive plans or other programs to preserve low-income housing within the framework of the federal prepayment scheme."). Indeed, as the *Frey* court noted, "other portions of the decision demonstrate that the Eighth Circuit did not adopt the categorical non-targeting rule that [PhRMA] contends should apply here." *PhRMA v. Frey*, 2026 WL 184504, at *15.

Contrary to PhRMA's assertions, OPCA does not blame the federal government's 2010 guidance related to contract pharmacies for any "additional work" by the government. PhRMA.Br.14 (citing OPCA.MSJ.Br.32). Rather, OPCA argues that H.B. 2385 does not cause additional work for the government because HHS has consistently conducted 200 audits on average since 2012, regardless of how many contract pharmacies covered entities have had, proving HHS's policing and monitoring of the program is not based on the number of contract pharmacies. Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28,643, 28,644 (April 19, 2004); OPCA.MSJ.Br.32. PhRMA retorts that the 340B statute allows drug manufacturers to "impose reasonable conditions" on distribution of 340B drugs because it is silent on delivery, but that silence works both ways. As the *Frey* court explained, the silence "does not necessarily mean that Congress intended to prevent state involvement or somehow limit the number of legitimate discounted claims." *PhRMA v. Frey*, 2026 WL 184504, at *13 (citing *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 985 (7th

Cir. 2012) ("[T]he pertinent question is whether [the federal law] prohibits state-imposed eligibility conditions, either expressly or by necessary implication. As we have noted, congressional and regulatory silence usually defeats a claim of preemption, not the other way around.")). The same statutory silence that forbids HHS from regulating delivery of 340B-priced drugs leaves from for states to require delivery. Therefore, the silence in the 340B statute supports the constitutionality of H.B. 2385.[4]

### B. The 340B Statute Does Not Give the Federal Government Exclusive Prerogative Over 340B Drug Distribution

Unable to show that H.B. 2385 directly regulates or discriminates against the federal government or manufacturers, PhRMA makes a blanket assertion that only the federal government can condition federal spending programs. That argument is not a part of an intergovernmental immunity doctrine analysis. *Washington*, 596 U.S. at 835. And again, there is no binding precedent (and PhRMA does not cite any) "requiring a different preemption analysis for laws passed under the Spending Clause." *McCuskey*, 171 F.4th at 697 (Benjamin, J., dissenting). PhRMA's argument "diverges from the near-unanimous view among federal courts" on federal preemption and "introduces unnecessary confusion into the preemption analysis." *Id.* at 701.

OPCA does not ignore a "wall of precedent" in arguing that state laws like H.B. 2385 do not infringe on a historically unique federal interest, PhRMA.Br.15, but rather relies on near unanimous decisions of district and circuit courts, as well as state courts. The Fifth and Eighth Circuits and numerous district courts have held that state laws similar to H.B. 2385 are not

---

[4] PhRMA speculates that HHS may need to conduct more audits or police more transactions. PhRMA.Br.14 n.3. Again, the United States does not argue this. U.S. Amicus Br. As mentioned above, *supra* p. 15, H.B. 2385 does not raise the number of 340B transactions. Finally, conjecture is not a valid basis on which to assess an alleged burden. *Walsh*, 538 U.S. at 667–68.

preempted by federal law. *See, e.g.*, *AbbVie, Inc. v. Murrill*, 166 F.4th 528 at 538–43; *AbbVie, Inc. v. Fitch*, 152 F.4th at 645–48; *McClain*, 95 F.4th at 1143–45; Order Denying Pl. Mot. For Prelim. Inj., *Weiser*, No. 25-cv-1847, at 7, 7–8 n.5 (collecting cases and recognizing the "very large majority" of lawsuits challenging state contract pharmacy laws that "have been unsuccessful to date"); *but see McCuskey,* 171 F.4th 675.

PhRMA admits that *Buckman* and *Boyle* are distinguishable on their facts. PhRMA.Br.15. The reasoning of those decisions is also inapplicable. As the Colorado district court determined, "*Buckman* and *Boyle* . . . do not support the broad contention that there is necessarily a field preemption issue where a state law explicitly depends on a federal statute." Order Denying Pls.' Mot. Prelim. Inj., *Weiser*, No. 25-cv-1847, at 14 (quotations omitted). Like AbbVie, PhRMA "has not identified a 'uniquely federal interest' here." *Id.*

Finding no statutory or legislative support for its assertion that the 340B statute concerns a uniquely federal interest, PhRMA turns to a United States amicus brief filed in a recent case to support its argument. PhRMA.Br.15–16. However, that brief is not supported by applicable case law and represents a complete about-face by the federal government because it is directly contrary to its longstanding recognition that state regulation of contract pharmacy distribution is consistent with the 340B statute. In 1996, HHS explained that contract pharmacy distribution arrangements do not "create a new right but rather [were] simply recognizing an existing right that covered entities enjoy *under State law*." Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) (emphasis added). In 2010, HHS again emphasized that contract pharmacy arrangements are governed, in part, by "State and local laws and regulations." Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,276 (Mar. 5, 2010).

## II. PhRMA's Field and Conflict Preemption Arguments Rest on a Mischaracterization of the 340B Program and Have Been Rejected by Multiple Courts

PhRMA's field and conflict preemption arguments rest on the false premise that the bargain drug manufacturers made when entering into the 340B Program does not obligate them to provide discounted drugs to all of a covered entity's eligible patients. This premise is antithetical to the text of the 340B statute, its legislative history, and basic common sense. Once corrected, PhRMA's preemption theories collapse.

### A. Congress Did Not Intend for Covered Entities to Underutilize the 340B Program

Manufacturers' contract pharmacy distribution restrictions have reduced the volume of 340B drug purchases by impeding patient access to the drugs. PhRMA seeks to rewrite the 340B statute to justify this underutilization of the 340B Program.

A consistent theme in PhRMA's brief is that covered entities' use of contract pharmacies to provide 340B drugs to patients, and state laws like H.B. 2385 that protect that use, have expanded the 340B Program beyond congressional intent. *See* PhRMA Br. 20. PhRMA argues that these alleged expanded obligations "disincentivize participation in the 340B Program" and cause manufacturers to rethink whether they "are actually willing to participate in the Program." *Id*. at 24. They also "increase the burdens on HHS to police" the Program because, according to PhRMA, Oregon has "graft[ed] its own conditions onto the 340B Program." *Id.* at 25, 28.

Congress created the 340B Program to reduce drug costs and to increase revenues for covered entities so that they can provide more services and care for more patients. H.R. Rep. No. 102-384 pt. 2, at 12 (1992); *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 730 (2022) (Congress intended 340B savings to "offset the considerable costs of providing healthcare to the uninsured and underinsured in low-income and rural communities."); *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 316 (D.S.C. 2023) ("[T]he purpose of the 340B Program was to provide a

means to make 340B entities profitable in order for those 340B entities to stretch scarce Federal resources as far as possible.") (quotations omitted). Covered entities' use of the 340B Program for 100% of their patients is consistent with and furthers the purpose of the 340B statute.

When manufacturers enroll in the 340B Program, they agree to offer 340B discounts on all outpatient drugs purchased by a covered entity for use by the covered entity's patients. *See* Sample PPA, HRSA. Drug manufacturers understand that this requirement applies to 100% of the covered entity's patients. The 340B statute limits the individuals to whom a covered entity may dispense 340B drugs to only the covered entity's patients. Inherent in that limitation is the legality of dispensing 340B drugs to all of the covered entity's patients.

Covered entities have relied on contract pharmacies to deliver prescription drugs to their patients since the inception of the 340B Program. *See* 61 Fed. Reg. at 43,550 ("There is no requirement for a covered entity to purchase drugs directly from the manufacturer or to dispense drugs itself. It is clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities."). Providing unrestricted use of contract pharmacies was the status quo, and manufacturers delivered 340B-priced drugs to contract pharmacies for more than two decades until 2020, when they unilaterally began implementing contract pharmacy restrictions.

Covered entities and their patients have suffered crippling consequences due to manufacturers' restrictive contract pharmacy policies. In 2020 and 2021, manufacturer restrictions threatened to cut "$8 billion or more to 340B safety-net funding." *Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals*, 340B Health, 1 (July 2023), https://www.340bhealth.org/files/Contract_Pharmacy_Financial_Impact_Report_July_2023.pdf. These policies resulted in over "$500 thousand in average annual losses to critical access

hospitals, while [disproportionate share] hospitals [were] losing an average of nearly $3 million every year." *Fact Sheet-340B Drug Pricing Program: Contract Pharmacy Arrangements*, Am. Hosp. Ass'n, 1 (Jan. 2025), https://www.aha.org/system/files/media/file/2020/10/fact-sheet-340b-drug-pricing-program-contract-pharmacy-arrangements.pdf. Continued restrictions are resulting in "exponentially increasing" losses, "with many reporting tens of millions in losses." *Id.* Manufacturers' unilateral restrictions "siphon[] billions of dollars away from providers and into drugmakers' pockets at the expense of at-risk patients and underserved communities who rely on 340B the most." *Statement on D.C. Circuit Appeals Court Decision on Drug Companies' 340B Restrictions*, 340B Health (May 22, 2024), https://www.340bhealth.org/newsroom/statement-on-d.c-circuit-appeals-court-decision-on-drug-companies-340b-restrictions/.

The loss of 340B savings has adversely affected federal grantees, like OPCA's members. The restrictions "have hit health centers and their patients hard," and "[m]any patients that benefit from price reductions offered by health centers though a contract pharmacy can no longer afford medications because of actions by [manufacturers]." *Manufacturer Restrictions on Contract Pharmacies*, Nat'l Ass'n of Comty. Health Ctrs, https://opus-nc-public.digitellcdn.com/uploads/nachc/redactor/f7c28bc2b8d6e670f44ac5dc12ad8bb8a2819461701eb61b96ba33cedf82e838.pdf (last visited May 12, 2026). Covered entities have reported staff layoffs, closed or consolidated outpatient behavioral health units, capped censuses in long-term-care units, terminated insulin patient assistance programs, closed rural health clinics, and withdrawal of support from school-based clinics. *340B Health Annual Survey 2022: Vital 340B-Supported Patient Services Threatened as Manufacturer Restrictions Cut Into Savings*, 340B Health, https://www.340bhealth.org/files/340B_Health_Survey_Report_2022_FINAL.pdf (last visited May 12, 2026). Patients are hurt "when the inability to access critical medications at an

affordable price leads to skipped doses, worsening health status, and emergency visits or hospital admissions." *Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals*, 340B Health, at 5.

H.B. 2385 was enacted to prohibit these delivery restrictions. It does not expand the 340B Program beyond its size prior to 2020 when drug manufacturers began restricting access to contract pharmacies. The Fifth Circuit aptly observed that a state law similar to H.B. 2385 "does not expand Section 340B's list of covered entities to include contract pharmacies." *AbbVie, Inc. v. Fitch*, 152 F.4th at 643, 647. H.B. 2385 does not increase the number of eligible 340B drug sales, which is limited solely by federal law.

### B. PhRMA's Manufacturer Protection Arguments Are Contrary to the Text and History of the 340B Statute and Basic Common Sense

PhRMA's manufacturer-protection theory is inconsistent with the text, structure, and history of the 340B statute. Congress did protect manufacturers, but it did so through express safeguards, not through limitations on the distribution of 340B drugs to contract pharmacies.

#### 1. Congress Protects Manufacturers by Limiting the Program to Covered Entity Patients, Not by Limiting Use of Contract Pharmacies

PhRMA argues that H.B. 2385 "upset[s] the careful bargain Congress struck" by preventing manufacturers from imposing contract pharmacy restrictions and thereby "forc[ing] manufacturers to sell to covered entities at 340B prices in circumstances where they otherwise would not." PhRMA.Br.2. That line of reasoning, however, misinterprets both the structure of the statute and the statutory limits to protect manufacturers.

Congress set limits to encourage manufacturer participation in the 340B Program, and to protect manufacturers from undue financial exposure, but in a fundamentally different manner than PhRMA asserts. Rather than restricting the use of contract pharmacies or controlling how 340B drugs are distributed, the statute limits the individuals to whom covered entities may dispense or administer those drugs by prohibiting covered entities from reselling 340B drugs to

non-patients or to Medicaid recipients "if the drug is subject to the payment of a rebate" to a state Medicaid program. 42 U.S.C. § 256b(a)(5)(A)–(B). The 340B statute also permits manufacturers to audit covered entities for compliance with those requirements "acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits." *Id.* § 256b(a)(5)(C); *see also* Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406 (Dec. 12, 1996). These provisions reflect Congress's deliberate choice of how to protect 340B-participating manufacturers from undue financial burden.

PhRMA argues that Congress intended to give manufacturers additional protections to justify the imposition of contract pharmacy restrictions by its members, but the text of the 340B statute does not support those arguments. The statute contains no language permitting manufacturers to impose delivery restrictions. As several courts of appeals have recognized, the 340B statute is "silent about delivery." *McClain*, 95 F.4th at 1143; *Sanofi*, 58 F.4th at 703; *Novartis*, 102 F.4th at 460–61.

PhRMA responds that, by requiring manufacturers to "offer" 340B discounts to covered entities, Congress intended to give manufacturers a right to condition the dispensation of 340B drugs through contract pharmacies. PhRMA.Br.3–4, 25 n.6. PhRMA relies solely on its interpretation of the statutory term "offer." Manufacturers' professed "discretion" to restrict contract pharmacies must, therefore, be implied, not expressed. PhRMA.Br.25. It is a well-settled principle of statutory construction that express terms prevail over implied interpretations. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62 (2002).

There is also a significant irony to PhRMA's argument that Congress intended to allow manufacturers to place conditions on the delivery of 340B drugs to contract pharmacies. In the

*Sanofi* and *Novartis* litigation, PhRMA's members forcefully, and repeatedly, argued that the 340B statute governs pricing, not distribution to support their case that HHS may not require manufacturers to deliver 340B drugs to contract pharmacies. AstraZeneca, for example, represented that it "continues to make its products available at 340B-discounted prices—in unlimited quantities—to all covered entities," while limiting only the locations to which those drugs are delivered. *See* Br. for Appellee AstraZeneca Pharms. LP at 15. Another manufacturer argued that "[t]he 340B statute speaks to the purchase of covered outpatient drugs by covered entities" and "says nothing about deliveries." Br. for Appellee Novartis Pharms. Corp. at 3, *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024), No. 21-5299, ECF 1949831. The courts agreed, holding that the text of the 340B statute is "silent about delivery." *Sanofi*, 58 F.4th at 703; *Novartis*, 102 F.4th at 460. But that silence does not mean that states are prohibited from adopting laws like H.B. 2385.

Congress chose to protect manufacturers through specific, express statutory safeguards: patient eligibility limits, diversion prohibitions, duplicate-discount protections, and audit rights. It did not adopt additional implicit restrictions on contract pharmacies or distribution.

**2. Manufacturers Agreed to the Terms of the 340B Program When There Were No Limits on Contract Pharmacies**

Subsequent congressional action confirms that PhRMA's reading is incorrect. PhRMA repeatedly argues that manufacturers' right to limit contract pharmacy arrangements in their 340B "offers" was part of the "bargain" Congress struck when enacting the 340B statute. PhRMA.Br.16–17, 23. PhRMA fails to mention that the term "offer" was not part of the original legislation but was added when Congress amended and expanded the law in 2010. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 7101–03, 124 Stat. 119, 821–28 (2010). At that time, HHS had expressly authorized covered entities to use multiple contract

pharmacies. 75 Fed. Reg. at 10,272. Congress's expansion of the 340B Program in 2010 included a mandate that manufacturers amend their PPAs to incorporate the new "offer" obligation and other statutory requirements. *Id.* By signing those amended PPAs, manufacturers agreed to participate in the Program *as it was operating at that time*, which included covered entities' use of multiple contract pharmacies.

### 3. The Use of Contract Pharmacies Is Consistent With the Program's Purpose to Serve More Patients and Provide More Comprehensive Services

As explained above, covered entities' use of the 340B Program for all of their patients is not only permitted by the 340B statute but furthers the statute's purpose. Covered entities enter into contract pharmacy arrangements as one way to ensure that all eligible patients can access the 340B discounted drugs. 75 Fed. Reg. at 10,277. The experience of OPCA's members demonstrates why contract pharmacy arrangements are necessary to achieve the 340B Program's purpose. OPCA's members include thirty-three community health centers that provide care to more than 470,000 Oregonians, all of whom must be treated regardless of their ability to pay. Tranchese Decl. ¶ 3. Many of those centers rely on contract pharmacies to dispense 340B drugs to their patients. *Id.* ¶ 6. In fact, thirteen OPCA members do not operate their own in-house pharmacies and rely entirely on contract pharmacies to provide patients access to 340B medications. *Id.* Even for health centers with in-house pharmacies, contract pharmacies are critical to making 340B medications available in convenient and accessible locations for patients. *Id.*

When manufacturers began restricting contract pharmacy arrangements, the result was not a correction of program abuses—it was a reduction in access and resources. Health centers were forced to change therapeutic options for patients, experienced reduced 340B savings available to support discounted care, and either had to shift costs to patients or to absorb those

costs. *Id.* ¶¶ 8–9. In 2023, Oregon health centers lost more than $10 million in 340B savings due to these restrictions. *Id.* ¶ 10. These effects directly undermine Congress's objective of enabling covered entities to stretch scarce resources to serve more patients.

#### 4. The Notion That Congress Intended to Protect Manufacturers from Covered Entities Furnishing 340B Drugs to More Eligible Patients Defies Common Sense

The dispute over contract pharmacies would not exist if covered entities could mandate that their patients fill prescriptions at the covered entities' in-house pharmacies. But patients of course have the freedom to choose where to fill their prescriptions, and, not surprisingly, they often choose pharmacies close to their homes. 61 Fed. Reg. at 43,552, 43,555; 75 Fed. Reg. at 10,278. Many urban covered entities use only one or two contract pharmacies or do not use them at all because their in-house pharmacies are already convenient. Safety-net hospitals and clinics located in rural areas are particularly dependent on contract pharmacies because their patients need access to pharmacies close to home or work.

PhRMA's contention that Congress designed the 340B Program to protect manufacturers from having to provide discounted drugs through contract pharmacies would mean that Congress intended to give covered entities in urban areas broader access to 340B drugs than those in rural areas. Nothing in the text of the statute or legislative history even remotely suggests such an odd outcome. Certain covered entities—for example, rural referral centers and critical access hospitals—qualify for the 340B Program based in large part on their location in rural areas. 42 C.F.R. § 412.96. Their rural status is why they are part of the safety net. Congress certainly did not qualify them on that basis while diminishing their access to discounted drugs for the same reason.

### C. Once It Is Understood That Covered Entities' Use of Contract Pharmacies Furthers Rather Than Frustrates the 340B Program's Purpose, PhRMA's Field and Conflict Preemption Arguments Fall Apart

PhRMA's field- and conflict-preemption arguments fail because they depend on a mischaracterization of the 340B statute and its purpose. As explained above, the arguments assume that contract pharmacy arrangements expand manufacturers' obligations under the 340B Program and alter the bargain that Congress intended when the 340B statute was enacted. They also assume that passage of the statute established a comprehensive federal regime governing not just pricing, but also the distribution of 340B drugs. Both assumptions are false. Properly understood, H.B. 2385 regulates post-purchase distribution within the states' traditional authority, does not alter federal pricing obligations, and does not conflict with federal enforcement mechanisms.

#### 1. H.B. 2385 is Not Field Preempted

PhRMA first asserts that H.B. 2385 intrudes on an "exclusively federal field" because it allegedly "alter[s] the 340B program's fundamental bargain" by "singling out federal program participants for extra burdens." PhRMA.Br.16–17. That argument rests on the incorrect premise that contract pharmacy access laws expand manufacturers' obligations under the statute. They do not. Manufacturers are *already required* to offer 340B pricing for drugs dispensed to *all* covered entity patients. *See supra* Sections II.A, II.B. H.B. 2385 does not expand eligibility or increase the volume of eligible discounted transactions; it prevents manufacturers from using delivery restrictions to *reduce* the number of transactions.

PhRMA's argument is also internally inconsistent. It contends that H.B. 2385 intrudes on an "exclusively federal" field, yet grounds its theory of the 340B "bargain" in the operation of Medicaid and Medicare participation incentives. *See* PhRMA.Br.22–23. But Medicaid is a

cooperative federal-state program. If, as PhRMA insists, the relevant "bargain" encompasses the operation of Medicaid, then the field cannot be exclusively federal.

PhRMA next argues that Congress's silence on delivery forecloses any state regulation, asserting that such silence is not "an invitation for states to step in" but instead confirms that no regulation addressing delivery, federal or state, is permitted. PhRMA.Br.18–20. That argument misstates settled preemption principles. As the Supreme Court has explained, "matters left unaddressed in [a federal] scheme are presumably left subject to the disposition provided by state law." *O'Melveny & Myers*, 512 U.S. at 85. And "[c]ongressional silence will not be presumed to mandate preemption." *Paul v. Monts*, 906 F.2d 1468, 1475 n.8 (10th Cir. 1990) (per curiam). Courts considering state laws analogous to H.B. 2385 have applied these principles, explaining that Congress's decision to remain silent on delivery acts to limit federal power; it does not extinguish traditional state authority over drug distribution. *See, e.g.*, Order Denying Prelim. Inj., *Weiser*, No. 1:25-cv-01847, at 13–14. Congress's silence thus constrains federal regulation without displacing state authority in an area Congress chose not to occupy.

The holdings in *Novartis* and *Sanofi* do not alter that analysis. Those decisions held only that HHS lacked statutory authority to impose delivery obligations. In doing so, the courts necessarily confined the relevant "field" (i.e., the scope of HHS's regulatory authority) of the statute, to pricing. If delivery fell within that field, then HHS would have authority to regulate it, a premise that both circuit courts rejected. Thus, the 340B statute regulates price, not distribution. While the statute's silence on delivery may "doom" an assertion of *federal* power in that domain, it does not displace *traditional state authority* to regulate it. *See* PhRMA.Br.18–19; *Novartis v. Frey*, 2025 WL 2813787, at *8.

PhRMA also invokes spending-clause principles, arguing that, because the 340B Program operates through a federal contract, states are prohibited from imposing obligations not clearly set forth in the statute or PPA. PhRMA.Br.16–20. But that argument again misconstrues the 340B Program's purpose and conflates pricing and delivery obligations. H.B. 2385 does not alter manufacturers' obligations under the PPA or impose new conditions on the federally defined pricing framework. It regulates post-purchase conduct—whether manufacturers may restrict delivery after a covered entity has exercised its federal right to purchase drugs at the statutory price. The 340B statute and PPA are silent on that subject.

PhRMA further argues that the presumption against preemption does not apply because the 340B Program reflects a significant federal presence, and H.B. 2385 is not a generally applicable law. PhRMA.Br.20–21. But as explained above, Congress's silence on delivery does not displace state authority; it preserves it. Regulation of pharmaceutical distribution, access, and availability falls squarely within the states' historic police powers, and H.B. 2385 governs precisely that conduct. Because the statute leaves that domain unregulated, the presumption against preemption applies with full force. *See McClain*, 95 F.4th at 1140.

**2. H.B. 2385 is Not Conflict Preempted**

PhRMA's conflict preemption arguments fare no better. It first contends that H.B. 2385 conflicts with the 340B statute because it goes too far in "further[ing] the program's purpose." PhRMA.Br.23. But as explained above, that argument rests on the incorrect premise that the statute limits utilization to protect manufacturers. *See supra* Sections II.A, II.B. It does not. Congress enacted the 340B Program to enable covered entities to stretch resources and serve more patients, and courts have rejected the notion that Congress intended to limit the number of legitimate discounted claims. *See Genesis Health Care, Inc.*, 701 F. Supp. 3d at 316; *Novartis v. Frey*, 2025 WL 2813787, at *11.

PhRMA next asserts that H.B. 2385 disrupts a “carefully calibrated balance” between reducing prices through the 340B Program and preserving manufacturer participation in related programs such as Medicaid and Medicare. PhRMA.Br.24. But PhRMA identifies no evidence that such a balance depends on the ability to restrict delivery through contract pharmacies. As discussed above, manufacturers’ obligations are defined by patient eligibility, not by delivery channels. *See supra* Sections II.A., II.B. Regardless, speculation about programmatic effects does not establish conflict preemption. *Walsh*, 538 U.S. at 646.

PhRMA also argues that H.B. 2385 conflicts with federal enforcement mechanisms because it limits manufacturers’ ability to collect claims data, alleging that the claims data is necessary for the manufacturer audit and ADR processes. PhRMA.Br.25–26. That argument is unfounded. Manufacturers have had audit rights since 1996, however, and those rights do not depend on conditioning delivery on the submission of claims data. 61 Fed. Reg. at 65,406. H.B. 2385 does not prohibit audits or the use of data where required by federal law; it prohibits manufacturers from withholding 340B drugs unless covered entities submit data that federal law does not require.

PhRMA contends that H.B. 2385 conflicts with the ADR process because HHS has asserted authority to resolve disputes involving “unduly restrictive contract pharmacy policies.” PhRMA.Br.26–27. PhRMA misstates the nature of HHS’s authority and again conflates distinct domains. The federal ADR process does not regulate contract pharmacy distribution. It adjudicates whether a manufacturer has complied with its statutory pricing obligation in a particular transaction. Contract pharmacy policies are relevant only as facts bearing on whether a pricing violation occurred; they are not themselves the subject of federal regulation.

H.B. 2385 governs delivery and access after a covered entity has lawfully purchased 340B drugs, including whether manufacturers may refuse to supply those drugs through contract pharmacies. It does not address 340B pricing calculations or adjudicate diversion or duplicate-discount claims. The existence of the ADR process to adjudicate pricing obligations does not preclude states from regulating related, but distinct, conduct.

Finally, PhRMA asserts that H.B. 2385 "grafts" new conditions onto the 340B Program and interferes with Congress's chosen methods. PhRMA.Br.28. That contention again depends on a misunderstanding of the 340B statute and collapsing the distinction between pricing and delivery. A state law does not become a pricing law merely because the product it regulates was purchased at a federally-determined price. Because H.B. 2385 operates in a field that Congress chose not to regulate, it does not add to or interfere with the federal scheme.

## III. H.B. 2385 is Not an Extraterritorial Regulation

PhRMA's extraterritoriality argument rests on a series of mistaken premises and an overbroad reading of Ninth Circuit precedent. PhRMA complains that OPCA does not rely on Ninth Circuit precedent, PhRMA.Br.28, but the Supreme Court's recent decision in *National Pork Producers Council v. Ross* ("*Pork Producers*") provides the governing framework for analyzing PhRMA's extraterritoriality challenge. 598 U.S. 356 (2023).

The extraterritoriality doctrine is narrow and does not invalidate state laws merely because they have upstream or downstream effects outside a state's borders. *Id.* at 386–90. Rather, a state law violates the extraterritoriality doctrine only if it directly regulates transactions occurring wholly outside the state. *Walsh* confirms this distinction, upholding Maine's drug discount program because it did not regulate the price of any out-of-state transaction "by its express terms or by its inevitable effect." 538 U.S. at 669–70.

Properly framed under this standard, H.B. 2385 easily passes muster under the extraterritoriality doctrine. It regulates in-state market access; specifically, manufacturers' ability to restrict delivery and dispensing of drugs in connection with the patients of Oregon covered entities. It neither establishes drug prices nor directly regulates transactions occurring wholly outside Oregon, and it is not rendered unconstitutional merely because it might have some effects beyond the State's borders.

Ninth Circuit case law is consistent with the understanding that extraterritoriality is a narrow doctrine, and *Sam Francis Foundation v. Christie's, Inc.* illustrates the limited scope of the extraterritoriality doctrine under Ninth Circuit precedent. 784 F.3d 1320 (9th Cir. 2015) (en banc). In that case, California imposed a resale royalty on transactions that occurred entirely outside the state based on the seller's residency—even where "the sculpture, the artist, and the buyer never traveled to, or had any connection with, California." 784 F.3d at 1323–25. The Ninth Circuit held that law unconstitutional precisely because it regulated transactions with no meaningful connection to California. *Id.* at 1324. Significantly, *Sam Francis* expressly distinguished state laws that regulate in-state conduct even if they have "significant out-of-state practical effects." *Id.* That distinction governs here.

H.B. 2385 regulates transactions anchored in Oregon. It applies only when manufacturers choose to make 340B drugs available to Oregon covered entities and regulates whether manufacturers may restrict delivery or dispensing of 340B drugs in connection to patients of those entities. H.B. 2385 does not regulate transactions based on residence, nor does it dictate the terms of transactions that occur wholly outside Oregon or directly regulate any such transaction. Rather, it regulates only drug delivery involving transactions by Oregon covered entities. In this case, unlike *Sam Francis*, the covered entity purchasing the drug is located in

Oregon and provides services to patients in Oregon. The pharmacy is simply the mechanism through which those drugs are supplied.

PhRMA's contrary argument rests on a mischaracterization of the relevant transactions. Its multi-state supply-chain hypothetical under which drugs move from manufacturers to out-of-state distributors and pharmacies misidentifies the conduct that H.B. 2385 regulates. PhRMA.Br.30. H.B. 2385 governs manufacturers' obligations in delivering the 340B-priced drugs that Oregon covered entities have purchased to Oregon. The involvement of out-of-state contract pharmacies reflects the manner in which drugs are delivered or dispensed on behalf of those entities, not a separate, wholly out-of-state transaction subject to independent regulation. That the logistics of delivery may cross state lines does not transform regulation of these in-state relationships into extraterritorial control of commerce occurring elsewhere.

Nor is this a case in which Oregon asserts authority based on "some nexus" to otherwise extraterritorial conduct. PhRMA.Br.29. Oregon covered entities are the focal point of the regulated transaction, and H.B. 2385 governs manufacturers' conduct in transactions undertaken on that entity's behalf. That is a substantial in-state connection, not the sort of attenuated link the Ninth Circuit has found insufficient.

*Rosenblatt v. City of Santa Monica* further confirms that a statute does not become extraterritorial merely because interstate actors or transactions are affected. 940 F.3d 439, 446–49 (9th Cir. 2019). There, the court rejected an extraterritoriality challenge even though the regulated transactions involved out-of-state parties, and operational aspects of the program occurred elsewhere, because every regulated transaction in *Rosenblatt* concerned property within the city. *Id.* at 445–47. The same reasoning applies here: each application of H.B. 2385 is anchored to an Oregon covered entity and its access to 340B drugs.

*Association des Éleveurs de Canards et d'Oies du Québec v. Harris* similarly underscores the point. 729 F.3d 937, 950–52 (9th Cir. 2013). There, California prohibited the in-state sale of foie gras produced by force-feeding, even though nearly all production occurred outside the state. *Id.* The Ninth Circuit rejected the argument that the statute regulated out-of-state production practices, holding that California was regulating access to its own market, and any upstream changes reflected producers' decisions to participate in that market. *Id.*

Likewise, *Rocky Mountain Farmers Union v. Corey*, rejected the argument that California's fuel standards impermissibly regulated extraterritorial conduct by influencing out-of-state production decisions. 730 F.3d 1070, 1102–04 (9th Cir. 2013). California was entitled to structure its internal market and regulate fuels sold in-state, even if doing so created incentives affecting out-of-state producers. *Id.* It emphasized that the regulation did not control conduct wholly outside the state but instead allowed firms to decide whether to adjust their operations in order to participate in the California market. *Id.* The same analysis applies here.

Those precedents also defeat PhRMA's remaining attempts to recharacterize the statute. That same reasoning forecloses PhRMA's contention that H.B. 2385 "in reality" regulates contracts between manufacturers and wholesalers or other out-of-state actors. PhRMA.Br.31. H.B. 2385 does not regulate those contracts, rewrite their terms, or mandate particular prices in those transactions. Instead, H.B. 2385 addresses manufacturers' ability to restrict downstream delivery and dispensing of drugs in connection with Oregon covered entities. Any effect on upstream contractual or pricing arrangements reflects manufacturers' independent business decisions about how to participate in that market, not any statutory command governing those transactions.

PhRMA's attempt to recast H.B. 2385 as a price-control statute likewise fails. As explained above, H.B. 2385 does not establish prices or control the terms of upstream transactions. Indeed, H.B. 2385 only applies to drugs that have already been purchased. Any alleged pricing effects arise from manufacturers' own choices about how to participate in the Oregon market, not from any direct regulation of out-of-state transactions. Unlike the price-affirmation statute invalidated in *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336–37 (1989), or the overbroad statute in *Sam Francis Foundation v. Christie's, Inc.* that directly regulated transactions occurring wholly outside the State, H.B. 2385 neither ties in-state prices to out-of-state sales nor regulates transactions occurring outside Oregon. Under *Pork Producers* and *Walsh*, H.B. 2385 does not violate the extraterritoriality doctrine of the dormant Commerce Clause.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in OPCA's opening brief, the Court should grant OPCA's cross-motion for summary judgment and deny PhRMA's motion for summary judgment.

Respectfully submitted,

LARKINS VACURA KAYSER LLP

/s/David G. Samuels
Christopher J. Kayser (OSB #984244)
ckayser@lvklaw.com
David G. Samuels (OSB #206308)
dsamuels@lvklaw.com
LARKINS VACURA KAYSER LLP
121 SW Morrison Street, Suite 700
Portland, Oregon 97204
Telephone: 503-222-4424

POWERS PYLES SUTTER & VERVILLE, PC

/s/Ronald S. Connelly
Ronald S. Connelly*
D.C. Bar No. 488298
William von Oehsen
Barbara Straub Williams
Fernando Montoya
Hannah Hauer
POWERS PYLES SUTTER & VERVILLE, PC
1250 Connecticut Ave. N.W., 8th Floor
Washington, DC 20036
T: (202) 466-6550
Ron.Connelly@PowersLaw.com
*Admitted pro hac vice

*Attorneys for Intervenor Oregon Primary Care Association*

Dated: May 27, 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,584 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

*/s/Ronald S. Connelly*
Ronald S. Connelly

**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

*/s/Ronald S. Connelly*
Ronald S. Connelly